## Commonwealth *vs.* Vuthy Seng.

Middlesex. February 7, 2002. - April 23, 2002.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Homicide. Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Capital case, Voluntariness of statement, Argument by prosecutor, Instructions to jury. *Search and Seizure,* Inventory, Fruits of illegal search.

In a homicide case, where two sets of warnings pursuant to *Miranda* v. *Arizona,* 384 U.S. 436 (1966), were given to the defendant, one in Khmer and the other in English, and where the version in Khmer, which was the defendant's native language, varied substantially from the required warnings, the defendant's waiver of his right to remain silent was not voluntary, knowing, and intelligent. [540-548]

At a murder trial, the judge erred in allowing in evidence bank records obtained as the result of an inventory search of the defendant's belongings at the police station, where there was no justification for recording the account numbers written on the back of a bank card found in the defendant's wallet during the inventory search; this court ordered that the bank records not be admitted in a retrial. [548-555]

At a murder trial, the prosecutor's repeated claims in closing argument that the defense had "insulted" the jury by evidence regarding the defendant's treatment at a State hospital was not improper, where the argument was the prosecutor's attempt to convince the jury that the defendant's insanity defense was not logical. [555-556]

At a murder trial, the judge's instruction to the jury not to infer guilt from the fact that the defendant had not submitted to a full psychiatric examination at a State hospital did not violate the defendant's right against self-incrimination, where the defendant had introduced the subject of his treatment for mental illness and thereby made his refusal to submit to a full examination an issue. [556-557]

Indictments found and returned in the Superior Court Department on December 21 and 29, 1995.

A pretrial motion to suppress evidence was heard by *R. Malcolm Graham,* J., and the cases were tried before *Thayer Fremont-Smith,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services

*(Catherine K. Byrne & Daniel E. Callahan,* Committee for Public Counsel Services, with him) for the defendant.

*Eric R. Barber-Mingo,* Assistant District Attorney *(Richard D. Grundy & Melissa Weisgold Johnsen,* Special Assistant District Attorneys, with him) for the Commonwealth.

COWIN, J. The jury rejected the defendant's insanity defense and convicted him on three indictments of murder in the first degree based on theories of deliberate premeditation and extreme atrocity or cruelty. The jury also found the defendant guilty of armed assault with intent to murder, assault and battery,[1] and possession of a firearm without a license. The defendant appeals from his convictions, claiming that (1) the admission of his statements to the police during a custodial interrogation violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution because the recitation to him of the Miranda rights was inadequate and because the statements were involuntary in the totality of the circumstances; (2) certain bank records were obtained improperly by exploitation of an inventory search for investigative purposes; (3) the prosecutor's repeated assertions to the jury that the defense had "insulted" them with evidence relating to the defendant's treatment at Bridgewater State Hospital prejudiced the defendant's insanity defense; and (4) the judge erred by instructing the jury against drawing an inference of guilt from any refusal by the defendant to participate in further evaluation of his mental state at Bridgewater State Hospital. We conclude that a faulty recitation to the defendant of the Miranda rights in the Khmer language prevented the defendant from executing a valid waiver of these rights, and that a subsequent reading to the defendant of the rights in the English language did not cure the defect sufficiently to permit a voluntary waiver. Accordingly, we reverse the judgments of conviction and order a new trial.[2]

1. *Facts.* We summarize the salient background facts the jury

---

[1]The judge dismissed these two assault and battery convictions as lesser included offenses of the murder convictions, but stayed dismissal pending the outcome of the present appeal.

[2]The defendant also claims prejudicial error from a police officer's statement of his disbelief of the defendant's responses during a custodial

could have found and reserve other details for discussion in conjunction with the specific issues raised. In November, 1995, the defendant lived in Lowell with Chhong Yim, and the victims,· Chhong Yim's three sons, ages fifteen, twelve and nine years, and her thirteen year old daughter, Sathy Men. Chhong Yim met the defendant in the early part of 1995, and in August, he moved in with her and her children. After the defendant was living in the apartment, the relationship soured. The defendant was very jealous of Chhong Yim and closely monitored her activities. Chhong Yim was unhappy with the defendant's inability to hold a steady job; his failure to pay his share of the rent (a condition of his moving in with the family); his habit of gambling at casinos; and his lack of a pleasant relationship with Chhong Yim's children. As a result, by October, 1995, she asked the defendant to move out. She said she did not love him, once more wanted to be alone with her children, and was even considering reconciling with her husband. The defendant refused to leave. Chhong Yim repeatedly asked the defendant to leave the apartment, to no avail. He insisted that he loved her and wanted to be with her. This situation apparently precipitated the defendant acting "different" toward the children and speaking to them even less than before.

On November 12, 1995, in the early morning hours, the defendant awoke Chhong Yim to ask what was the most important thing in her life. She replied, "gold, diamonds, money not important to [her]," but that "[her] children very important · to [her] . . . more than anything in the world." Later that day, Chhong Yim visited friends in Lowell. The defendant unexpectedly arrived at the friends' home shortly thereafter. Chhong Yim told the defendant again that he must move from her apartment, this time insisting on a deadline: by the end of the month. The defendant appeared dismayed and visibly upset by this demand. He told Chhong Yim that he was going to a party, but did not do so. Instead, he went to the apartment next door to Chhong Yim's and telephoned her at her friends' home, begging her to give him another chance. She refused to do so, and, suspicious of the defendant's whereabouts, asked several times where he

---

interrogation. Because of our disposition of the issue regarding the motion to suppress, we need not address this contention.

was. In response, the defendant lied and said that he was at another friend's house.

After the fruitless telephone conversation with Chhong Yim, the defendant returned to Chhong Yim's apartment, where he shot the four children who were home alone. Although the children tried to run away, they were unsuccessful, and each was shot in cold blood at least once. The defendant also stabbed one of the boys three times in the neck with a large knife. Sathy Men, the girl, fought the defendant and tried to flee a number of times, even after being shot. She finally kicked out a window screen and escaped by jumping out the window (the apartment was on the first floor).

After leaving the three young boys to die in the apartment, the defendant ran from the scene, but remained nearby. The defendant was observed disposing of something in a trash barrel. The police discovered the murder weapon in that barrel the next day.

The three boys succumbed to their wounds in the days following the attack. Sathy Men survived. In the hours following the shootings, she recounted the details of the violence to the police from her hospital bed and identified a photograph of the defendant. The police arrested the defendant at a friend's home and brought him to the Lowell police station, where he was booked. He was given his Miranda rights first in Khmer and then in English, and made statements to the police. At trial, given the testimony of the eyewitness, Sathy Men, the primary defense was lack of criminal responsibility. The Commonwealth used the defendant's statements to combat this defense.

2. *Motion to suppress.* The defendant claims that the motion judge erred in refusing to suppress his statements to the police because the Miranda warnings were inadequate: they were given to him in both Khmer and in English, and the Khmer version, given first, varied substantially from the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966).[3] See *Commonwealth* v. *Adams*, 389 Mass. 265, 269 (1983).

The motion judge found that after the defendant was booked

---

[3]The defendant further argues that his statements should be suppressed because they were not voluntary in the totality of the circumstances, see *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959

at the Lowell police station, and before he was interrogated, Officer Socheath Toun (a Cambodian immigrant whom the Lowell police often used as an interpreter), provided the defendant "a less than complete and accurate version of the Miranda warning in Khmer," and that the officer also advised the defendant of his "full Miranda rights in English." Although the judge made no finding as to the sequence of the warnings, the specific defects in the Khmer version, or that Khmer was the defendant's native language, there is no dispute that the warnings in Khmer preceded the English version, or that the defendant's native language was Khmer. As to the defects in the Khmer version of the warnings, the Commonwealth provides nothing in the record to contest Officer Toun's interpretation of the Khmer version. Thus, we accept his interpretation.

In regard to the defendant's understanding of English, the judge found that during the interview with the police, the defendant said that he understood English, and the officers were able to understand him; and that throughout the booking and interrogation processes, the police asked the defendant numerous questions in English, to which he responded appropriately in English. Further, the judge found that the defendant had communicated with the police in English several months before the instant crimes when the defendant was a victim of a home invasion; that when he was interrogated in Khmer by staff of the Cambridge jail about certain facts relevant to the instant crimes, he responded as he had when previously questioned by the Lowell police in English; and that the one time that the defendant indicated to the police that he could not understand a word (apparently at the booking that preceded the interrogation), the defendant was provided an interpreter. The latter fact, the judge found, indicated that the defendant was not afraid to indicate incomprehension if it existed and also "that thereafter he had no reason" to believe that a "complaint of incomprehension would be made in vain." The judge concluded that the Commonwealth had met its burden of demonstrating that the defendant possessed sufficient fluency to understand and voluntarily waive his Miranda rights when advised in English,

---

(1976). Because we conclude that his statements must be suppressed because the warnings given were inadequate, we do not reach this issue.

"despite the fact that [the] reading of the Miranda warning" in Khmer "was less than complete and accurate."

We have examined the record of the motion to suppress to discern the specific deficiencies in the Khmer warnings. Officer Toun, who advised the defendant of his rights in both languages, testified at the motion hearing that at the police station he had read the defendant a standard form Miranda warning sheet that includes the warnings in both English and Khmer. The defendant signed the form to indicate that he understood what had been read to him. This signed form was introduced in evidence and the officer used that form to "translat[e] into English [the rights] as they appeared [in Khmer] on that sheet" (i.e., the officer translated the rights as they appeared on the form in Khmer into English at the motion hearing):[4]

> "Number one stated, before they ask any questions, you must understand clearly before you answer them. . . .
>
> "Number two. If you don't understand these rights clearly, then you should not be answered at all. . . .'
>
> "Number three. Whatever you say, words must be truthful. If not truthful, then it must be — must not be spoken. . . .
>
> "Number four. You have the right to get a lawyer to help you and advise you during questioning.
>
> "Before you — before they ask you any questions, you should have your attorney with you while answering any questions. . . .
>
> "Number five. Whenever you don't have any money to hire a lawyer, one will — it states here, they can help find one for you. . . .
>
> "Number six. Whenever you decided [*sic*] to answer any questions on your own without the lawyer present,

---

[4]Defense counsel objected to Officer Toun's translating the form because Toun was not qualified as a court interpreter. It is regrettable that the Commonwealth did not present a certified court interpreter to interpret the Khmer on this key issue.

some of the questions that you don't understand you have the right to stop at any time until you speak to a lawyer. . . .

"Number seven. Do you understand all these rights listed above. . . .

"Number eight. If you understood all these, do you wish to speak."

On review of a motion to suppress, we do not disturb the judge's findings of fact unless they are clearly erroneous and we give deference to the judge's legal conclusions, but independently review the correctness of the judge's application of constitutional principles to the facts found. See *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). "Whether [the defendant] was given adequate Miranda warnings is a question of law that is reviewed de novo by the appellate court." *United States* v. *Connell*, 869 F.2d 1349, 1351 (9th Cir. 1989).

The defendant contends that admission of his statements in evidence violated the dictates of *Miranda* v. *Arizona, supra,* and was clear error. We agree. In *Miranda,* the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. In delineating these procedural safeguards the Court stated that "the following measures are *required.* Prior to any questioning, *the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him,* and that he has a right to the presence of an attorney, either retained or appointed" (emphasis supplied). *Id.* "The defendant may waive these rights, provided that the waiver is made voluntarily, knowingly, and intelligently but 'unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.' " *Commonwealth* v. *Adams,* 389 Mass. 265,

268 (1983), quoting *Miranda* v. *Arizona, supra* at 479. "[W]hat
*Miranda* requires 'is meaningful advice to the unlettered and
unlearned in language which [they] can comprehend and on
which [they] can knowingly act.' *Coyote* v. *United States,* 380
F.2d 305, 308 (10th Cir.), cert. denied, 389 U.S. 992 . . .
(1967); see also [*California* v. *Prysock,* 453 U.S. 355, 364 n.3
(1981)] (Stevens, J., dissenting) (quoting *Coyote*)." *United
States* v. *Connell, supra* at 1351.

In this case, the Commonwealth did not meet its " 'heavy'
burden," *Commonwealth* v. *Boncore,* 412 Mass. 1013, 1015
(1992), of demonstrating that the defendant was advised of his
rights in a meaningful way that he could comprehend. The
Khmer version of the rights was deficient in several key
respects. The defendant was not advised of his right to remain
silent. Indeed, several of the warnings implied the opposite.
Warning number three advised: "[w]hatever you say, words
must be truthful," and warnings number one, two, and six sug-
gested that the defendant should not answer questions only if he
did not understand them.

The defendant was never advised in Khmer that anything he
said could be used against him in court. As we have stated:
" 'The warning of the right to remain silent *must* be ac-
companied by the explanation that anything said can and will
be used against the individual in court' (emphasis added).
*Miranda* [v. *Arizona*], *supra* at 469. This warning 'is an absolute
prerequisite to interrogation.' *Id.* at 471. The Court explained
that: 'This warning is needed in order to make [the accused]
aware not only of the privilege, but also of the consequences of
forgoing it. It is only through an awareness of these conse-
quences that there can be any assurance of real understanding
and intelligent exercise of the privilege.' *Id.* at 469. Our cases
have recognized the mandatory nature of this warning." *Com-
monwealth* v. *Adams, supra* at 269.

The final defect in the Khmer warnings was the failure to
state that a lawyer would be appointed if the defendant could
not afford one. Warning number four stated only that if you
don't have money for a lawyer, "they can help find one for

you,"[5] although warnings number four and six did advise that the defendant had a right to have a lawyer during questioning. In *Commonwealth* v. *Colby*, 422 Mass. 414, 418 (1996), we assumed that a similar statement to the defendant ("if he could not afford an attorney, the Commonwealth would attempt to provide one for him") was a "departure from the standard Miranda language."

The above provides ample foundation for the motion judge's conclusion that the Miranda warnings provided in Khmer were "less than complete and accurate." We have not previously considered whether Miranda warnings, given incorrectly in one's native language, are then "cured" by an accurate rendition of the warnings in English. However, we have considered somewhat similar situations in which both correct and incorrect statements of the warnings were provided in English. In *Commonwealth* v. *Dustin*, 373 Mass. 612, 613-615 (1977), cert. denied, 435 U.S. 943 (1978), the defendant, who had been given the Miranda warnings twice in one evening, indicated that he understood them and did not want to make a statement. He also consulted with two attorneys, both of whom advised him not to talk to the police. On the following day, while still in custody, the defendant asked an officer at the jail: " 'If I tell you something about the incident, will I be admitting my guilt?' The officer replied, 'You are not on the stand and you are not under oath. You can tell me anything you want to.' " *Id.* at 613. We said that the officer's response "carried an implication that [the defendant's statement] could not be [used against him]. This was directly contrary to the required Miranda warning that anything the defendant said could and would be used against him in court." *Id.* at 615. We concluded that two proper recitations of Miranda warnings did not immunize a statement obtained after the police had advised the defendant "directly contrary" to a required portion of the warning and affirmed the motion judge's suppression of the defendant's statement made after the faulty advisement. *Id.* at 614-616.

---

[5]One could speculate that Officer Toun may have recognized this deficiency when, in reading warning number five, he stated: "Whenever you don't have any money to hire a lawyer, one will — *it states here*, they can help find one for you" (emphasis supplied).

In *Commonwealth* v. *Coplin*, 34 Mass. App. Ct. 478 (1993), the defendant was provided complete Miranda warnings while he was lying on the floor handcuffed. An officer testified that it was his "impression" that the defendant "appeared to understand" what he had been told. *Id.* at 480. At the station, the Miranda warnings were given to the defendant both orally and in writing but did not contain the warning that anything the defendant said could be used against him in court. The Appeals Court concluded that, in these circumstances (no proof beyond a reasonable doubt that the defendant understood and voluntarily waived his rights when he was lying on the floor), the Commonwealth had not met its heavy burden of proving waiver. The complete set of warnings given at the time of arrest did not carry over to the events relatively soon after at the police station.[6] *Id.* at 481-483.

The case of *Commonwealth* v. *Mendiola*, 976 F.2d 475 (9th Cir. 1992), involving facts quite similar to those at bar, is instructive. The defendant was given "local statutory rights [which differed from Miranda] as well as Miranda rights in both English and Chamorro, his native language." *Id.* at 478, 481. The local statutory rights preceded the Miranda warnings and, inter alia, informed the defendant "that a lawyer or other person would be contacted if such contact could be effected at no cost to the government or if he could pay for the call in advance." *Id.* at 482. Then the defendant received his Miranda rights. *Id.* The court stated: "[T]he warnings were equivocal, contradicting, and open to misinterpretation. [The defendant's] ability to draw the inference that he was entitled to *appointed* counsel before and during questioning was made more tenuous by the initial statement that a lawyer or other person would not be contacted unless it could be accomplished at no cost to the government. Because of this initial statement, it was not clear

---

[6]By comparison, where we assumed without deciding that the defendant received incomplete Miranda warnings (omitting the fact that anything he said could be used against him in court), this defect was cured by two complete correct recitations and by the fact that the defendant signed a card containing the complete warnings before he made any statement. Further, the defendant had exercised his right to remain silent after the first inadequate warning. See *Commonwealth* v. *Scott*, 430 Mass. 351, 354 (1999).

whether appointed counsel would be provided before question-
ing or at some future date." *Id.* at 482-483.

We conclude that where two sets of warnings are given and
one is defective or incomplete and the circumstances are such
that the defendant would be confused by the discrepancy or
omission, a waiver so obtained is not voluntary. See *United
States* v. *Garcia*, 431 F.2d 134 (9th Cir. 1970) (conviction
reversed because defendant given several different versions of
"Miranda bundle of warnings," none completely correct; warn-
ings "[t]aken together . . . were inconsistent" and, thus,
inadequate). See also 2 W.R. LaFave & J.H. Israel, Criminal
Procedure § 6.8(c) (2d ed. 1999).[7]

Here, the reading of the rights in English was preceded by
Officer Toun telling the defendant, "I'm going to read it to you
in English now . . . I'm going to read in English . . . ."[8]
Characterizing the reading of the rights in English (not the
defendant's native language) as essentially a repetition of what
had just been stated in Khmer could only have had the impact
of reinforcing the erroneous warnings. It essentially integrated
the erroneous Khmer warnings into the English version. The
omission of key warnings from the Khmer version that were
then included in the English version, particularly when Khmer

---

[7]"What if both oral and written warnings were given but one version was
defective or incomplete? Courts have held that if either the written warnings
or the oral warnings were deficient in some respect, it suffices that the other
set of warnings was complete and correct. This may be a sensible result when
the difference between the two sets of warnings is merely that something was
omitted from one of them. *But if the conflict between the two is such that the
suspect would be confused by the discrepancy, then a contrary result is neces-
sary*" (emphasis supplied). 2 W.R. LaFave & J.H. Israel, Criminal Procedure
§ 6.8(c) (2d ed. 1999).

[8]DEFENSE COUNSEL: "Did you tell him, 'I'm going to read it to you in English
now?' "

WITNESS: "Yes, I did."

DEFENSE COUNSEL: "Basically you told him that what you just read him in
Khmer you're now going to read in English."

WITNESS: "I'm going to read in English, correct."

DEFENSE COUNSEL: "So, he's already heard — what you told him in English,
he'd already heard in Khmer."

WITNESS: "Right."

DEFENSE COUNSEL: "And you told him that."

WITNESS: "Yes, sir."

was the defendant's native language, and the officer's indication that he was going to repeat in English what had already been said in Khmer, could only have been confusing. The Commonwealth has failed to meet its burden of proving that there was a voluntary, knowing, and intelligent waiver of the right to remain silent. Cf. *Commonwealth* v. *Mandeville*, 386 Mass. 393, 403-404 (1982).

It cannot be said that this error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Hosey*, 368 Mass. 571, 579 (1975). The statements that the defendant made after receiving the defective warnings were used by the Commonwealth to strike at the heart of his insanity defense. The Commonwealth's expert witness, a psychiatrist, opined that these statements by the defendant made to the police just after the crimes indicated the absence of a "significant mental disease or defect at that time" and "a very high level of mental cognitive functioning [by] somebody that is able to process information, manipulate information, and has full capacity of [his] mental facilities." The Commonwealth also used these statements of the defendant in closing argument to argue to the jury that the defendant was "a person who [was] thinking . . . a person who [was] reacting . . . a person who [knew] exactly what he did." The defendant, therefore, must be afforded a new trial. We address only the remaining issues likely to arise at retrial.

3. *Bank records.* The defendant contends that bank records were illegally obtained by "exploitation" of an inventory search of his belongings at the police station, i.e., that the inventory search was used for investigatory purposes, and that the bank records were used to defeat the defendant's insanity defense. During trial, an officer testified that, on the night of the defendant's arrest, a bank card was taken from the defendant's wallet. The bank card contained the name of the Shawmut Bank and its logo on the front,[9] with checking and savings account numbers handwritten in appropriate spaces on the back. We have examined the card. It is not the type of bank card that may be used to obtain money from an automatic teller machine or with which one could make purchases.

---

[9]Also on the front of the card was some printed information and handwritten notations not relevant here.

Prior to trial, the Commonwealth summonsed the bank's keeper of records for the "records or account information" of the defendant for the two account numbers listed on the back of the bank card in question, as well as any other accounts in his name. Defense counsel moved orally to suppress the card[10]; it was not admitted at that time. Defense counsel subsequently filed a written motion to suppress "all evidence obtained pursuant to a warrantless search of the defendant's wallet, as well as the fruits of that search [because] it went beyond a mere search incident to arrest, and instead amounted to a full investigation of the contents of the wallet." Defense counsel submitted an accompanying memorandum that argued that this warrantless search exceeded the permissible scope of a search in the circumstances because it examined items within the wallet and used them to obtain further information.

A hearing was held on the motion. The prosecutor argued that during an inventory search the police found the bank card with information on it that the defendant has an account at a particular bank.[11] Defense counsel maintained that this warrantless search violated the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. The judge concluded, pursuant to the holding in *Commonwealth* v. *Sullo*, 26 Mass. App. Ct. 766 (1989), that the police could note "the limited information that is on the card [that] is clear and obvious." Defense counsel objected to the judge's ruling.

The defendant now argues that the search was improper because there was no showing that (1) the inventory was conducted according to standard police procedures as required by the Fourth Amendment to the United States Constitution, see *Florida* v. *Wells*, 495 U.S. 1, 4-5 (1990); *Colorado* v. *Bertine*, 479 U.S. 367, 374 (1987), or that any procedures that were followed were written, as required by art. 14, see *Commonwealth* v. *Bishop*, 402 Mass. 449, 451 (1988), or that the search of the

---

[10]No issue is raised in this court regarding the timeliness of the motion or of any discovery on this issue.

[11]He also argued that the information would inevitably have been discovered because the defendant's former wife had informed the Commonwealth that she had a bank account with the defendant during the same time period.

wallet was within the scope of any written procedures, *id.*; (2) the examination of the back of the bank card was not within the proper limits of a search for custodial purposes, *Commonwealth* v. *Sullo, supra* at 769; and (3) the police here were not simply inventorying the contents of the wallet, but using the search for investigatory purposes. Such a search for evidence requires a showing of probable cause and exigent circumstances if no warrant is obtained. *Id.* at 772.

The defendant did not raise below his first grounds of objection (those relating to whether the inventory was conducted pursuant to written police procedures or whether the search exceeded the scope of such procedures). "A defendant 'is not permitted to raise an issue before the trial court on a specific ground, and then to present that issue to this court on a different ground.' " *Commonwealth* v. *Clark,* 378 Mass. 392, 397 (1979), quoting *Commonwealth* v. *Flynn,* 362 Mass. 455, 472 (1972). This waiver doctrine is inapplicable where an error below would create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Clark, supra.* See also *Commonwealth* v. *Johnson,* 46 Mass. App. Ct. 398, 400 (1999). Because of our resolution of the remaining issues concerning the motion to suppress, we need not address these issues regarding the inventory procedure.

We discuss together the second and third issues raised by the defendant and start with the familiar proposition that "[s]earches and seizures conducted outside the scope of valid warrants are presumed to be unreasonable. In such circumstances, the burden is on the Commonwealth to show that the search or seizure falls within a narrow class of permissible exceptions." *Commonwealth* v. *Rodriguez,* 378 Mass. 296 (1979), citing *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 57 (1974). See *Chimel* v. *California,* 395 U.S. 752, 762 (1969). The exception applicable here is the inventory search. It is clear that, before a person is placed in a cell, the police, without a warrant, but pursuant to standard written procedures, may inventory and retain in custody all items on the person, including even those within a container, such as a wallet, see *Commonwealth* v. *Bishop, supra* at 451; *Commonwealth* v. *Wilson,* 389 Mass. 115, 117 (1983). Such searches are justified to safeguard the defendant's property, protect the police against later claims of

theft or lost property, and keep weapons and contraband from the prison population. See *id.* at 117 & n.2. Such inventory searches are intended to be "noninvestigatory." See *Commonwealth* v. *Alvarado*, 420 Mass. 542, 553 (1995). In this case, it is necessary to determine precisely what "noninvestigatory" means to determine whether the police properly could read the information on the bank card.

In *Commonwealth* v. *Sullo*, 26 Mass. App. Ct. 766 (1989), the Appeals Court, faced with a similar situation, carefully examined the extent to which our State and Federal Constitutions permit the Commonwealth to use material discovered in an inventory search. The court concluded that the evidence seized from a defendant's wallet in that case (writings on business cards and papers that a witness testified he recognized as a "cuff list" for a gambling operation) should have been suppressed because it was the result of an unlawful investigatory search, i.e., a search for evidence, rather than a lawful inventory search. *Id.* at 772. The *Sullo* opinion distinguished between such evidence and evidence that is obvious on its face: "We can even assume arguendo that the police are not required to blind themselves to information appearing on a paper or card that declares its nature to anyone at sight, such as a driver's license or credit card." *Id.* at 770.[12]

As the Appeals Court recognized in the *Sullo* case, enforcement of the Fourth Amendment and art. 14 requires a distinction between an inventory search and an investigatory search. If, during an inventory search, a police officer views material that is obvious, such as the writing on the card here that indicates that it is issued by Shawmut Bank, it is not realistic to expect the officer to forget what he has seen; and no purpose is served by requiring him to do so.[13] The officer therefore may utilize the information so acquired. There is a substantial difference, however, between observing the "Shawmut Bank" letter-

---

[12]We read this sentence to mean that the police need not "blind themselves" to obvious facts that identify an item as a driver's license or a credit card. That the sentence was not intended to mean that the police may take note of all the data on those documents is apparent from a complete reading of *Commonwealth* v. *Sullo*, 26 Mass. App. Ct. 766 (1989).

[13]This situation may be analogized in some respects to the plain view doctrine. See *Commonwealth* v. *Balicki, ante* 1, 8 (2002).

ing and logo on the front of the card and examining the card closely enough to comprehend (and record) the multi-digit account numbers that were written on the back of the card. In this case, no valid inventory purpose would be served by recording the detailed information. It may be, however, that in some situations, recording the numbers on a card in a wallet may serve a valid inventory purpose. For example, there may be legitimate reasons (such as protecting the police against claims of theft or misuse) to record in an inventory search the identifying numbers of cards that can be used to obtain items of value, such as credit cards, charge cards or cash cards.

Distinguishing between inventory and investigatory searches in this manner is not peculiar to Massachusetts: see, e.g., *Waine* v. *State*, 37 Md. App. 222, 234 (1977) (officers exceeded scope of reasonable inventory search by reading papers in defendant's personal effects); *State* v. *Rodewald*, 376 N.W.2d 416, 421-422 (Minn. 1985) (suggesting that illegality, if any, in reading cards in wallet might have justified suppression of cards and their contents, if State wanted to use them as evidence); *State* v. *Mordeszewski*, 68 Wis. 2d 649, 659 (1975) (where officer validly searching defendant's wallet to sort papers and check for razor blades testified that headline of newspaper clipping about recent rape merely "caught his eye," "it would be unreasonable to say he could not legally notice what he was seeing in open view"). See also *D'Antorio* v. *State*, 926 P.2d 1158, 1165 (Alaska 1996) (detailed reading of papers found in inventory search of defendant's car violates reasonable expectation of privacy and cannot be sustained under inventory exception, but reading and listing names *and* numbers on credit cards seized during inventory was reasonable to protect property and to protect police against claims of lost or stolen property, and "this information declares itself on sight" to inventory officer).

The United States Supreme Court has also struggled with this issue. See *South Dakota* v. *Opperman*, 428 U.S. 364 (1976) (five-to-four decision), and especially the oft-quoted language of Justice Powell, *id.* at 380 n.7 (Powell, J., concurring): "As part of their inventory search the police may discover materials such as letters or checkbooks that 'touch upon intimate areas of an individual's personal affairs,' and 'reveal much about a

person's activities, associations, and beliefs.' . . . In this case the police found, *inter alia,* 'miscellaneous papers,' a checkbook, an installment loan book, and a social security status card. . . . There is, however, no evidence in the record that in carrying out their established inventory duties the[] police do other than search for and remove for storage such property without examining its contents." (Citations omitted.) One commentator has stated that the *Opperman* case "quite conclusively indicates that a majority of the Court would not approve of such a practice [examination of personal papers] as part of the routine vehicle inventory process." 3 LaFave, Searches & Seizures § 7.4(a), at 560 (3d ed. 1996). More recently, the United States Supreme Court has stated: "The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.' " *Florida* v. *Wells,* 495 U.S. 1, 4 (1990), quoting *Colorado* v. *Bertine,* 479 U.S. 367, 376 (1987) (Blackmun, J., concurring).

Finally, the American Law Institute Model Code of Pre-Arraignment Procedure 530 (1975) provides: "Generally speaking, none of [the legitimate purposes of a custodial search] will justify reading the accused's papers, except for the limited purposes specified in subsection (2) [of Section SS 230.6]." Subsection 2 of Section SS 230.6 states in part: "Documents or other records may be read or otherwise examined only to the extent necessary for such [custodial] purposes, including identity checking and ensuring the arrestee's physical well-being." *Id.* at 146. See *Commonwealth* v. *Sullo, supra* at 769.

Applying the principles distinguishing an inventory from an investigative search to the facts before us, the information on the front of the bank card, that it is a Shawmut bank card, declares its nature to anyone at sight. The account numbers written on the back of the card are not as obvious and would not be recalled simply from a permissible inventory viewing. "What the police may not do is hunt for information by sifting and reading materials taken from an arrestee which do not so declare themselves." *Id.* at 770. Nor would there be any need for the police to record the account numbers on an inventory list, given that this particular card was of no value. Contrast

*D'Antorio* v. *State, supra.*[14] Recording this information would not serve any of the generally accepted objectives of an inventory search preceding incarceration.

The information on the back of the card was not overtly incriminating. It most likely became useful as an investigative tool at a later point during the investigation.[15] As the Appeals Court concluded in *Commonwealth* v. *Sullo, supra* at 772: "In making an inventory . . . the police are to act more or less mechanically, according to a set routine, for to allow then a range of discretion in going about a warrantless search would be to invite conduct which by design or otherwise would subvert constitutional requirements." The police need not "blind themselves" to information visible during an inventory search; what they may not do is investigate the information in the wallet without obtaining a search warrant.[16]

Accordingly, here, it would have been improper for the police to read and record the information on the back of the bank card. It may well be that a permissible reading of the name of the bank would have enabled the Commonwealth to obtain the records, but to the extent discernible from this record, it appears that access to the bank account data resulted from an impermissible investigatory search of the handwritten numbers on the back of the card. The Commonwealth, having been alerted to the constitutional issue here (by oral and written motions), failed to present any evidence to carry its burden to establish that this was a lawful inventory search. See *Commonwealth* v. *Sullo, supra* at 772. The argument that occurred before the

---

[14]We do not decide today whether writing or numbers on any other types of cards may be permissibly recorded during an inventory search. That is a question dependent on the facts of each case.

[15]It does not appear that the relevance of the defendant's gambling habits was clear at the time the inventory search was conducted. Although it does not affect our decision, we assume that this matter developed importance as the police became aware that the defendant's gambling was a source of friction between him and Chhong Yim.

[16]Our decision does not mean that police may never obtain or record additional information, such as the numbers on the back of the defendant's bank card. We require only that they secure a warrant before doing so. Once the police become aware that the material may be of evidentiary value (here, because of the relevance of the defendant's gambling), they will likely have the probable cause necessary for a warrant. However, the inventory search exception will be strictly limited to the purposes underlying that exception.

judge does not substitute for the evidence on which a judge could rest adequate findings.[17] The bank records are to be excluded from any retrial. See *Commonwealth* v. *Rodriguez, supra*, 302-304.[18]

4. *Closing argument.* The defendant also claims that the prosecutor impermissibly argued in closing that the defense had "insulted" the jury by evidence regarding the defendant's treatment at Bridgewater State Hospital (hospital). The defendant cites three passages to this effect.[19] Defense counsel objected immediately after the argument and asked for an instruction regarding the improper argument. "The prosecutor is entitled to argue the evidence and fair inferences to be drawn therefrom," *Commonwealth* v. *Paradise*, 405 Mass. 141, 152 (1989), but may not appeal to the emotions of the jury. *Commonwealth* v. *Gordon*, 422 Mass. 816, 830-831 (1996). There is a distinction between a dramatic description in an argument and an argument designed to appeal to the jury's emotions. The former is properly

---

[17]The prosecutor also argued that the records would inevitably have been discovered, see note 11, *supra*. Again, no evidence was introduced at the hearing to support this theory on which the judge, or this court, could ground a ruling.

[18]Because of our resolution of this issue, we make no comment regarding whether the defendant's person and the effects previously taken from him during booking remain "fair game" for a warrantless ("second" or closer look) search during the period of his incarceration. See *United States* v. *Edwards*, 415 U.S. 800 (1974).

[19]The prosecutor in closing argument to the jury repeatedly assailed the defense follows:

> "[L]et me just say how much the defense asks you to look at the Bridgewater State Hospital records developed by this defendant close to two years after the fact to try and explain away the shooting deaths of [the victims], and be insulted because you should be. . . .

> "And to draw your attention to matters after the fact, after a human being has been charged and it is very clear that they will stand trial for the murder of three children, that they have developed a depressive [dis]order and therefore are not criminally responsible for those murders is insulting, and nothing less. . . .

> "That's what's going on at Bridgewater State Hospital, and you should be insulted that they now come to you, and that's the sum total of their defense."

used as an aid to the jury in evaluating the merits of a proposition the Commonwealth places before the jury. Comments that appeal to emotions are ones that have the effect of engendering the jury's anger toward the defendant or his counsel so as to evoke an emotional rather than an intellectual response. The argument here was the prosecutor's attempt to convince the jury that the defendant's insanity defense was not logical, and, while close to the line, considered in context, was not improper. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 388 (1992) ("It is not improper for the prosecutor to suggest to the jury that the defendant attempted to 'fool' them"). See also *Commonwealth* v. *Obershaw*, 435 Mass. 794, 808 (2002) (statement that testimony of defendant was "an insult to the jury" was no more than "rhetorical flourish"). Further, we "assume a 'certain measure of jury sophistication' in sorting out excessive claims." *Commonwealth* v. *Lyons*, 426 Mass. 466, 474 (1998), quoting *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987).

5. *Instruction.* The final issue that may arise on retrial is that the judge instructed the jury, over the defendant's objection, not to infer guilt from the fact that the defendant did not submit to a full psychiatric examination at the hospital.[20] The defendant claims that this instruction violated his right against self-incrimination under art. 12 of the Massachusetts Declaration of Rights, as construed by *Commonwealth* v. *Zevitas*, 418 Mass. 677 (1994). The defendant specifically claims that the judge's

---

[20] "As I have told you, any questions by a lawyer are not evidence even though they may imply something, and that goes for the lawyers on either side of the case. Any questions by the prosecution which may have implied that the defendant declined to cooperate in further evaluation of his mental state at the Bridgewater State Hospital are not evidence.

"I'm not saying that there were any such questions, but if there were any evidence in that regard it's not to be considered by you as bearing at all on the guilt or innocence of the defendant. The defendant had a perfect right to decline, if he did, to participate in further evaluation, and no inferences of guilt or lack of criminal responsibility can be drawn from a defendant's failure, if there was one established here, and I am not saying there was any such evidence, to participate in further evaluation.

"If there was evidence of a limited opportunity of the Commonwealth to do further evaluation, to the extent there was such evidence, you may consider that only as it might relate to the issue of the reasons for the medication of the defendant at the Bridgewater State Hospital, that would be the only relevance of that type of information."

instruction informed the jury that he had exercised his right not to submit to a full psychiatric examination. The *Zevitas* case involved a prosecution of a vehicular homicide by reckless or negligent operation while under the influence of alcohol. At trial there was no evidence that the defendant had refused a blood alcohol test. But the judge "told the jury, by strong implication at least, that the defendant's blood alcohol level had not been tested, and that the reason no test was conducted was that the defendant refused to submit to such a procedure." *Id.* at 683. We held that such instructions regarding a defendant's refusal to submit to a breathalyzer test violated the privilege against self-incrimination because that interpretation of the law compelled him to furnish evidence against himself.

Here, the defendant, through his expert witness, attempted to convince the jury that he was taking various medications at Bridgewater because he was mentally ill. On cross-examination, the Commonwealth permissibly required the expert to explain that the hospital personnel decided to medicate the defendant because he would not permit them to conduct a thorough psychiatric examination of him. In such circumstances, where the defendant introduced the subject and made refusal an issue, he may not then assign as error the judge's instructions on the point. Thus, it was not improper for the judge to instruct the jury that they should not use the defendant's lack of participation in a psychiatric examination as bearing on the defendant's guilt or criminal responsibility.[21] Cf. *Commonwealth* v. *Martinez*, 431 Mass. 168, 183-184 (2000) (where proper to admit testimony concerning defendant's invocation of right to remain silent, judge should instruct jury as to limited purpose of evidence and that no negative inference should be drawn from defendant's invocation of his rights).

6. *Conclusion.* Because the defendant's statements to the police should have been suppressed, the judgments are reversed, the verdicts set aside, and the cases remanded to the Superior Court for a new trial.

*So ordered.*

---

[21] If an instruction were to be given, it should be given at the time of the testimony. It may be repeated during the final instructions.