COMMONWEALTH vs. KASHMONI MURPHY
(and a companion case[1]).

No. 04-P-349.

Suffolk. December 6, 2004. - February 11, 2005.

Present: LENK, GRASSO, & GRAHAM, JJ.

*Motor Vehicle,* Firearms. *Search and Seizure,* Impoundment of vehicle, Inventory, Probable Cause, Fruits of illegal search. *Constitutional Law,* Investigatory stop, Stop and frisk.

This court concluded that a Superior Court judge properly allowed a motion to suppress evidence of a firearm seized from one criminal defendant's vehicle, where a police officer improperly transformed an inventory search of that defendant's person into an investigatory search of his rented vehicle when he used not overtly incriminating information on the keys the police were safeguarding as part of the inventory search to match those keys to the vehicle, which was illegally parked [15-17]; likewise, the judge properly ordered the suppression of drugs found on the other defendant's person, where nothing in the facts as a whole raised a reasonable apprehension of danger to the police or others that justified the initial, or subsequent, frisk of that defendant's person pursuant to a show of authority with which a reasonable person would feel compelled to comply [17-19].

INDICTMENTS found and returned in the Superior Court Department on November 6, 2002.

A pretrial motion to suppress evidence was heard by *Janet L. Sanders,* J.

*Donna Jalbert Patalano,* Assistant District Attorney, for the Commonwealth.

*John F. Coffey* for Kashmoni Murphy.

*Scott P. Curtis* for Michael Brown.

GRASSO, J. A judge of the Superior Court allowed motions to suppress evidence filed by the defendants Kashmoni Murphy

[1]Commonwealth *vs.* Michael Brown.

and Michael Brown, resulting in suppression of a gun found in a motor vehicle rented by Murphy and drugs found on Brown's person.[2] The matters come before us on the Commonwealth's interlocutory appeal, allowed by a single justice of the Supreme Judicial Court under Mass.R.Crim.P. 15(b), as appearing in 422 Mass. 1501 (1996), and reported to this court for determination. We affirm the orders of suppression.

1. *Background.* Murphy is charged in indictments that allege assault and battery, trafficking cocaine, possession of cocaine with intent to distribute, trafficking and possession of cocaine with intent to distribute in a school zone, unlawful possession of a firearm, and being an armed career criminal. Brown is charged in indictments that allege trafficking cocaine, possession of cocaine with intent to distribute, and trafficking and possession of cocaine with intent to distribute in a school zone. All indictments arise from an incident occurring on September 11, 2002, and its aftermath.

We summarize the facts found by the motion judge, which we supplement with uncontested testimony from the suppression hearing, *Commonwealth* v. *Sweezey,* 50 Mass. App. Ct. 48, 49 (2000), mindful that assessment of witness credibility is the province of the motion judge. See *Commonwealth* v. *Gutierrez,* 26 Mass. App. Ct. 42, 47 (1988).[3]

2. *Facts.* Early in the morning of September 11, 2002, several police officers responded to a police radio broadcast reporting a large fight in the vicinity of Stuart and Tremont Streets in

---

[2]On appeal, Murphy asserts that the Commonwealth seeks to introduce the drugs found on Brown's person as evidence in the drug indictments against him. To the extent that Murphy is a codefendant with Brown in indictments that allege possessory offenses, he may assert an expectation of privacy in items seized from Brown. See *Commonwealth* v. *Frazier,* 410 Mass. 235, 243 (1991); *Commonwealth* v. *Carter,* 424 Mass. 409, 411 (1997) (defendant and confederate treated as one for purpose of determining reasonable expectation of privacy, otherwise the person who carried the contraband might go free while confederate would not). Such a motion must be raised and decided in the trial court in the first instance.

[3]"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002).

Boston. State police Trooper Stephen P. Johnson was the first to arrive at the scene, followed shortly thereafter by Boston police Officer Jerome Hall Brewster, who was on bicycle patrol.

Trooper Johnson observed a large crowd gathered in front of the Europa nightclub, yelling and pushing. As he approached the crowd, Johnson saw a male, later identified as Murphy, strike a female in the face with a closed fist, knocking her to the ground. This appeared to incite the crowd further. In response, Officer Brewster employed a short burst of a mace-like spray to disperse the crowd.

At that point, Trooper Johnson noticed Murphy walking away. He ordered Murphy to stop. Murphy turned to face Johnson and began to backpedal quickly. At Johnson's second order to stop, Murphy turned and ran. Johnson gave chase, catching up to Murphy and grabbing him. As he did, Johnson saw Murphy throw a plastic baggie to the ground.

While Trooper Johnson was handcuffing Murphy and placing him under arrest, Officer Brewster retrieved the baggie and gave it to Johnson. It contained a hard, rock-like substance that Johnson believed to be crack cocaine. Before putting Murphy in the cruiser, Johnson conducted a search of Murphy's person for weapons and other contraband. He found only some personal papers and a set of keys that he returned to Murphy.

With Murphy in custody in the cruiser, Trooper Johnson redirected his efforts toward the crowd, which still numbered about twenty people. At that point, an individual, later identified as Brown, approached Officer Brewster and Trooper Johnson and showed them a gold chain. Brown told them that the chain belonged to Murphy, said that he wanted to give it to Murphy, and related some of his observations of the melee. Brewster told Brown to sit down on the curb and directed his efforts to controlling the crowd. Brown complied.

Officer Brewster then instructed police Officers Lynwood Jenkins and Al Young, who had just arrived on the scene, to conduct a "field interrogation observation" (FIO) of Brown.[4]

---

[4]Jenkins described a "field interrogation observation" as an interaction in which police identify a person and "find out their business in the area."

Jenkins approached Brown, conducted a pat frisk of Brown's person, and asked him for identification. Jenkins found nothing in the patfrisk. In response to the request for identification, Brown produced an identification card bearing a photograph of someone other than himself. When Jenkins pointed out the discrepancy, Brown acknowledged that it was not his card and admitted that he had used the card in order to get into a nightclub.

Jenkins then asked for, and Brown supplied, his name, address, and date of birth. With this information, Jenkins used his portable police radio to call the dispatcher and determine if Brown had any outstanding warrants. The dispatcher responded that Brown had no outstanding warrants, but stated that Brown's driver's license was suspended. Brown overheard the response and told Jenkins that he did not even have a driver's license.

Officer Jenkins decided to make a second check using the mobile data terminal in his police cruiser that was parked nearby. As Jenkins proceeded toward the cruiser, Officer Young, who was assisting Jenkins, asked Brown to accompany them to the cruiser. Before escorting Brown to the cruiser, Young placed his hands on Brown and began a second patfrisk of Brown's person. As he did, he noticed a small plastic bag protruding from the zipper area of Brown's pants. The bag contained a brownish substance that appeared to Young to be drugs. Young called to Jenkins for assistance, spun Brown around, and handcuffed him. Young seized the bag, which was found to contain several smaller bags of a substance believed to be crack cocaine, and arrested Brown.

Shortly thereafter, Officer Jenkins returned to the Area A-1 police station at Government Center where Murphy was undergoing booking. During the inventory search of Murphy's person, Jenkins noticed a set of keys taken from Murphy and picked them up to examine them. He noted that the keys were from a rental car company and contained information describing a Nissan automobile with a specified license plate number.

At the time of Murphy's arrest, there were several illegally

parked cars on Stuart Street with parking citations on them.[5] Acting on a hunch, Officer Jenkins took the keys from the booking area and returned to Stuart Street to ascertain whether the license plate information on Murphy's keys matched any of the illegally parked vehicles. Jenkins arrived there at about 4:00 A.M. and saw a lone Nissan, with a citation affixed, parked in a zone that forbade overnight parking. The Nissan's license plate number matched that on the keys taken from Murphy.

Jenkins decided to impound the Nissan. Prior to the vehicle being towed, he conducted an inventory search that resulted in the discovery of a handgun under the front seat.

3. *Discussion.*

A. *Search and seizure from Murphy.* There is no suppression issue regarding the cocaine that Murphy discarded as he fled from Trooper Johnson. Johnson observed Murphy commit an assault and battery and had probable cause to arrest him. See *Commonwealth* v. *Gorman*, 288 Mass. 294, 297 (1934); *Commonwealth* v. *Williams*, 422 Mass. 111, 119 n.11 (1996). The contraband abandoned by Murphy as he fled was properly the subject of a plain view observation and plain view seizure. See *Commonwealth* v. *Nutile*, 31 Mass. App. Ct. 614, 619 (1991) (no expectation of privacy in drugs thrown from car). See also *Commonwealth* v. *Walker*, 370 Mass. 548, 557, cert. denied, 429 U.S. 943 (1976) (evidence inadvertently coming into view during arrest may be seized without search warrant); *Commonwealth* v. *Cruz*, 53 Mass. App. Ct. 24, 35 (2001) (same).

The firearm seized from the Nissan stands on different footing. The motion judge concluded that seizure of the firearm violated the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights because the impoundment of the vehicle by Officer Jenkins was a pretext for an investigatory motive that invalidated the subsequent inventory search of the vehicle. On appeal, the parties again focus on the propriety of the impoundment. We conclude that the discovery and seizure of the firearm fails, not because Jenkins harbored an investigatory motive, see *Com-*

---

[5]The motion judge specifically discredited Officer Jenkins's testimony that he recalled seeing a Nissan with a parking citation among the many vehicles on Stuart Street at the time of Murphy's arrest.

*monwealth* v. *Garcia*, 409 Mass. 675, 679 (1991), but because the police improperly transformed an inventory search of Murphy's person into an investigatory search. See *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 550-554, cert. denied, 537 U.S. 942 (2002) (in inventory search, police may observe and utilize information that is obvious or "overtly incriminating," but may not examine papers); *Commonwealth* v. *Blevines*, 438 Mass. 604, 609 (2003) (leaving undecided whether police officer's noticing that key was for particular vehicle was a plain view observation).

The fact that an officer harbors a suspicion that evidence of criminal activity might be uncovered during an inventory search does not vitiate his obligation to conduct the inventory. See *Commonwealth* v. *Garcia*, 409 Mass. at 679, and cases cited. Here, however, the determination to impound the vehicle was itself the product of an unlawful investigatory search and seizure of keys taken from Murphy during the inventory search of his person. Observation of the information on the keys went far beyond the cursory. Officer Jenkins scrutinized the keys, noted that they belonged to a rented Nissan with a particular license plate number, and took the keys from the police station to Stuart Street in an attempt to match them to an illegally parked motor vehicle. The detailed observation and examination of the information on the keys, and the seizure and taking of the keys to Stuart Street, was an unlawful search and seizure rather than a proper plain view observation made in the course of a lawful inventory search of Murphy's person.

The information on the keys as to the make, model, and license number of the vehicle was not "overtly incriminating," and recording that information did not serve any of the generally accepted objectives of an inventory search. See *Commonwealth* v. *Vuthy Seng*, 436 Mass. at 550-551. Nor, in this context, was the level of detail obtained from the keys the kind of obvious facts to which police need not blind themselves. *Id.* at 551 & n.12. See *Commonwealth* v. *Sullo*, 26 Mass. App. Ct. 766, 770 (1989). Even if recording that information were proper, the police went far beyond the custodial necessities of safeguarding the keys. Removing the keys from the station to match them to an illegally parked vehicle is not part of the

inventory process, but an investigatory use of an item taken for safekeeping. See *Commonwealth* v. *Vuthy Seng*, 436 Mass. at 550-552.

We are not faced here with a situation where the police prepared to impound and tow an illegally parked vehicle without regard to the information obtained during the inventory search of Murphy's person. Compare *Commonwealth* v. *Henley, ante* 1, 4-6 (2005). Rather, the police did not decide to impound the vehicle until after Officer Jenkins improperly used the keys the police were safeguarding as part of the inventory search of Murphy's person. Nor is this a case where a cursory observation to which Jenkins need not have blinded himself prompted his return to Stuart Street. The differences are constitutionally significant. The inventory search exception to the search warrant requirement is strictly limited to the purposes underlying that exception. *Id.* at 554 n.16.[6]

Accordingly, the firearm found in the Nissan (but not the drugs discarded by Murphy) must be suppressed.

B. *Search and seizure from Brown.* Officer Brewster did not violate constitutional principles when he responded to Brown by directing him to stand aside so that the police could disperse the crowd. So long as the police do not employ words or conduct from which a reasonable person might conclude that he is not free to leave, the police do not need a constitutionally adequate basis, or any basis, to approach an individual, strike up a conversation, and request information. See *Commonwealth* v. *Thomas*, 429 Mass. 403, 406-407 (1999). In such circumstances, the individual's willingness to remain or to reply is purely voluntary. From all that appears, Brown was initially free to leave if he wished. *Ibid.* See *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996) (adopting *Mendenhall*[7] "free to leave" standard for stop under art. 14).

Conversely, when police employ words or conduct from

---

[6]Before Officer Jenkins's detailed examination of the keys, the police had no basis to conclude that Murphy had been operating a motor vehicle in the vicinity of the observed assault and battery, that a vehicle was implicated in that assault, see *Commonwealth* v. *Brinson*, 440 Mass. 609, 615 n.6 (2003), or that the keys were evidence of a crime.

[7]*United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980).

which a reasonable person would conclude that he is not free to leave, the encounter is not voluntary and a constitutionally sufficient basis must support such a show of authority. See *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985). Merely applying the label "field interrogation observation" to the police-citizen encounter does not insulate it from constitutional scrutiny.

We recognize that in responding to the scene, the police encountered a large crowd that warranted the exercise of caution. See *Commonwealth* v. *Almeida*, 373 Mass. 266, 270-271 (1977) (purpose of frisk is to allow police to pursue appropriate investigation without fear of violence). However, nothing in the facts as a whole raised a reasonable apprehension of danger to the police or others that justified the initial, or subsequent, frisk of Brown's person. See *Commonwealth* v. *Fraser*, 410 Mass. 541, 544-545 (1991) (constitutional measure for frisk is whether reasonable person in officer's position would fear for safety of himself or others). There were no reports of firearms or other weapons at the scene. Compare *id.* at 542-543; *Commonwealth* v. *Rock*, 429 Mass. 609, 612-613 (1999); *Commonwealth* v. *Johnson*, 36 Mass. App. Ct. 336, 337 (1994); *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 673, 676 (2000). None of the officers saw Brown engaging in assaultive conduct, or had any other basis for concluding that he had a weapon or had been involved in any assaultive conduct. See *Commonwealth* v. *Silva*, 366 Mass. 402, 406-407 (1974). The police observed no bulge in his clothing, or furtive gesture or behavior. See *Commonwealth* v. *Johnson*, 413 Mass. 598, 601 (1992) (suspect stuffed something in his pants).

To the contrary, Brown approached police only to advise them that he had a gold chain belonging to Murphy, who was in custody, and to relate some of his observations of the melee. Brown never threatened the police, used harsh language, or gave other reason to believe that he posed a danger or that he might be armed. See *Commonwealth* v. *Tomeo*, 400 Mass. 23, 25 (1987); *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 314-315 (1992).

When Officer Jenkins approached Brown to conduct a field interrogation observation, nothing in the facts permitted Jenkins

to pat-frisk Brown or to detain him. Moreover, the demand that Brown produce identification, made as Jenkins conducted a first patfrisk, was not a request for voluntary cooperation, but a show of authority with which a reasonable person would feel compelled to comply. See *Commonwealth* v. *Thinh Van Cao,* 419 Mass. 383, 387-388, cert. denied, 515 U.S. 1146 (1995) (no stop in circumstances of field interrogation observation because reasonable person would feel free to terminate the encounter); *Commonwealth* v. *Stoute,* 422 Mass. at 786. Compare *Hiibel* v. *Sixth Judicial Dist. Ct.,* 542 U.S. 177, 187-188 (2004) (*Terry*[8] principles permit State to require a suspect to disclose his name in the course of a *Terry* stop); *Commonwealth* v. *Evans,* 436 Mass. 369, 374-376 (2002) (permissible to request license and registration information in context of community caretaking responsibilities). At that time, the factual predicate for a frisk of Brown's person, for his detention, or for the demand that he produce identification, was lacking. The second frisk of Brown by Officer Young, which led to the discovery of cocaine on Brown's person, suffers from the same deficiencies.[9]

Accordingly, the motion judge correctly ordered that the drugs found on Brown's person must be suppressed.

> *Order allowing motions to sup-*
> *press affirmed.*

---

[8]*Terry* v. *Ohio,* 392 U.S. 1 (1968).

[9]The Commonwealth does not argue, and there is no basis for concluding, that Brown's possession of false identification constituted a crime that established independent and objectively reasonable grounds for arrest, see *Devenpeck* v. *Alford,* 543 U.S. 146 (2004), and for a search of his person incident to that arrest. This discovery was itself the fruit of the first unlawful frisk. Similarly, the police were not entitled to demand that Brown remain until clarification of the status of his driver's license, even more so where there was no indication Brown was driving a motor vehicle at the time.