## COMMONWEALTH *vs.* OLAJUWAN JONES-PANNELL.

No. 13-P-7.

Suffolk. November 8, 2013. - June 2, 2014.

Present: KATZMANN, GRAINGER, & SIKORA, JJ.

Further appellate review granted, 469 Mass. 1106 (2014).

*Constitutional Law,* Stop and frisk, Reasonable suspicion. *Search and Seizure,* Protective frisk, Reasonable suspicion, Threshold police inquiry. *Threshold Police Inquiry. Practice, Criminal,* Motion to suppress, Findings by judge. *Firearms.*

A District Court judge erred in allowing a criminal defendant's pretrial motion to suppress evidence discovered by a police officer during a patfrisk, where, collectively, the officer's training and nine years' experience in the district, the history of firearms in the neighborhood, the late hour, the defendant's head movements, his continuous placement of his hand inside his pants, and his accelerating evasion of the police established reasonable suspicion of unlawful possession of a firearm at the moment when the defendant was stopped (i.e., when the defendant turned a corner at either a walking or jogging pace and the officer stepped out of his patrol vehicle, called to the defendant, "Wait a minute," and began to pursue him). [395-398]

Statement that a judge hearing a criminal defendant's pretrial motion to suppress evidence should not preface findings of fact with a notice that the facts found are the "only" facts found by the court based on credible testimony, given that such a statement creates an ambiguity or gap, i.e., whether the judge overlooked a significant subsidiary finding or whether the judge distrusted or discredited the testimony of a witness, and thereby prevents the reviewing court from readily adding findings in order to resolve an appeal (causing substantial delay and inefficiency if a remand is needed). [398-399]

COMPLAINTS received and sworn to in the Roxbury Division of the Boston Municipal Court Department on August 8 and 25, 2011.

After transfer to the Central Division of the Boston Municipal Court Department, a pretrial motion to suppress evidence was heard by *Raymond G. Dougan,* J.

An application for leave to prosecute an interlocutory appeal

was allowed by *Francis X. Spina*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Cailin M. Campbell*, Assistant District Attorney, for the Commonwealth.

*John O. Mitchell* for the defendant.

SIKORA, J. Between midnight and 1:00 A.M. on August 6, 2011, two Boston police officers attempted to stop and question the defendant, Olajuwan Jones-Pannell, on Norfolk Avenue in the Roxbury section of Boston. He fled. One of the officers pursued on foot and overtook him. As they grappled, a handgun containing seven rounds of ammunition fell from the defendant's pants. Complaints issued out of the Roxbury Division of the Boston Municipal Court Department charging the defendant (after subsequent amendment) with carrying a loaded firearm without a license, G. L. c. 269, § 10(*n*); carrying a firearm without a license, G. L. c. 269, § 10(*a*); possession of ammunition without a firearm identification card, G. L. c. 269, § 10(*h*)(1); and resisting arrest, G. L. c. 268, § 32B.[1] The defendant moved to suppress all evidence resulting from the encounter. After an evidentiary hearing and legal argument by all counsel, the motion judge allowed the motion to suppress and ordered the entry of a memorandum of decision comprised of findings of fact and conclusions of law.

The Commonwealth sought leave to pursue an interlocutory appeal from the suppression order. A single justice of the Supreme Judicial Court granted leave for an appeal to this court. See G. L. c. 278, § 28E; Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996). For the following reasons, we now reverse.

*Factual and procedural background.* 1. *Testimonial evidence.* The sole witness at the suppression hearing was one of the two arresting officers, Luis Anjos. Under direct and cross-examination, he testified to the following salient points.

At the time of the encounter he had served with the Boston police department for nine years. He had worked in the Rox-

---

[1] The case subsequently was transferred to the Central Division of the Boston Municipal Court Department.

bury district throughout that time. His basic training at the Boston police academy had included instruction for identification of persons carrying concealed firearms. According to that instruction, an unlicensed carrier will be less likely to employ a holster and therefore more likely to be adjusting a weapon manually inside his clothes. Another characteristic will be his head movements in multiple directions in an effort to anticipate and to avoid detection.

On August 6, 2011, Anjos was engaged in an overnight shift as one of two uniformed officers in an unmarked patrol car in the Norfolk Avenue area. Anjos occupied the passenger seat. The neighborhood contained three or four gangs. Two weeks earlier in that area, he had responded to a gunfire incident resulting in a neck wound to a victim. Three to four months earlier, another shooting incident had occurred in the vicinity. On a separate occasion during that period, police had recovered a firearm.

At approximately 12:30 A.M., Anjos and his partner saw the defendant walking alone along the Norfolk Avenue sidewalk on Anjos's side of the car. As the defendant walked, he held his right hand inside the front of his pants and was "jousting" or "adjusting" an object. He saw the car, appeared surprised, and looked up and down the street.

As the car drew even with the defendant, Anjos two or three times asked, "Excuse me sir, can I talk to you?" The defendant looked away, continued down Norfolk Avenue, and kept his right hand inside his pants. He turned a corner, and accelerated into a jog. His right hand remained inside his pants. At that point Anjos yelled, "Wait a minute," and got out of the cruiser. The defendant then broke into a full sprint. Anjos pursued him on foot, as his partner followed in the car. The chase ensued for twenty to thirty seconds through one and one-half blocks. Anjos overtook the defendant in a driveway. As Anjos attempted a patfrisk, the defendant resisted. As they grappled, a handgun fell out of the defendant's pants. Anjos placed the defendant under arrest and read him his Miranda rights. A subsequent inspection of the handgun housing revealed the seven rounds of ammunition.

Until these events, Anjos had no familiarity with, or knowledge

about, the defendant. Anjos and his partner had received no information of any incident in the area during that evening.

2. *Judge's findings.* The judge prefaced his subsidiary findings with a short statement: "The following facts are the only ones found by the court based on credible testimony presented at the hearing on the motion to suppress." For purposes of our review, his significant findings were the following.

a. Although the police were aware of (i) "some undescribed gang activity in [the Norfolk Avenue] area," (ii) a report of " 'shots fired' about two weeks before," (iii) the "recovery of a gun and a shooting in the six months before," and (iv) "some crimes that had been reported in the neighborhood," the judge found that Norfolk Avenue "between East Cottage Street and Burrell Street was not a high crime area or so-called 'hot spot.' "

b. The defendant did have his right hand inside his pants as he walked along Norfolk Avenue.

c. As the police vehicle approached, the defendant "looked towards [it], looked up and down the street and continued walking."

d. As the defendant turned a corner off Norfolk Avenue, Anjos got out of the patrol car and called, "Wait a minute." Then the defendant began to jog, and Anjos began pursuit.

e. As he chased, Anjos could see the defendant pumping his left hand but saw no action from the right hand.

f. Anjos caught up with the defendant after a short distance.

g. Anjos had completed an eight-hour course entitled "characteristics of armed gunmen" concerning the detection of concealed, unholstered weapons.

h. Neither officer had any prior knowledge of the defendant. They were not responding to any radio calls.

While the judge credited Anjos's description of the defendant's evasion by posture and faster walking, he found that the defendant had begun to jog away from the police only after Anjos emerged from the vehicle and called, "Wait a minute." Anjos testified that he had taken that action only after the defendant had accelerated from a faster walk to open jogging as he turned off Norfolk Avenue. The judge did not specifically contradict or disbelieve that testimony. He credited Anjos with brief

early training in the detection of concealed weapons, but did not describe the instruction about adjusting an unholstered firearm and head movement (so-called "swiveling" behavior) in anticipation of detection or flight. The judge did not refer to Anjos's report of nine consecutive years of duty in the district. Nor did he relate Anjos's specification that the neighborhood shooting incident of two weeks earlier had inflicted a neck wound upon a victim.

*Analysis.* 1. *Suppression rationale.* The judge concluded that the police had executed a stop within the meaning of *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968), at the moment when Anjos stepped out of the patrol vehicle; called to the defendant, "Wait a minute"; and began to pursue him. The judge then assessed the evidence and made findings as of that moment for the presence of reasonable suspicion of the prior, present, or oncoming commission of a crime necessary for the stop.

> "The factors that the court finds that support a conclusion that reasonable suspicion existed in this case are limited: flight from police officers and [the defendant] keeping his right hand in his pants between his waist and his crotch. That it was just after midnight adds little if anything to the calculus of reasonable suspicion. Other factors that in some cases support a finding of a reasonable suspicion are missing: this was not a high crime area; the police didn't know the defendant; there were no reports or radio calls of a crime having been recently committed in the area; the officers were on routine patrol.

> "Not responding to a police officer's request to submit to questioning or trying to evade a police officer may be stupid or futile but it is not against the law and does not alone provide a basis of reasonable suspicion to a police officer to stop an individual. Holding your hand to your waist or inside your pants while running from the police may be a characteristic of an armed gunman, as taught in the [police academy] course that Anjos completed, but there are other reasons why someone would act in this manner, e.g. holding your baggy, unbelted pants up or holding onto a wallet or some item other than a handgun. . . .

"In the present case only two, but an important two, factors were present: evasion and/or flight and a hand at or inside a waistband during evasion and/or flight. While significant and a cause for further investigation including continuing to follow [the defendant], these two factors taken together, absent more, are not enough to support a conclusion of reasonable suspicion that would allow an *arrest.*[2] Motion is allowed. All evidence that resulted from the seizure is suppressed." (Emphasis supplied.)

The judge cited dicta in *Commonwealth* v. *Grandison*, 433 Mass. 135, 139 (2001), for the points that neither mere presence in a high crime area nor walking away from the police, respectively, furnishes reasonable suspicion for a threshold stop, but acknowledged that apparently innocent activities, in the aggregate, can support the necessary reasonable suspicion. Finally, he distinguished the present findings from those in *Commonwealth* v. *Sykes*, 449 Mass. 308, 314-315 (2007) (one of several cases relied on by the Commonwealth at the hearing on the motion to suppress), by reason of the more numerous suspect circumstances in that case.[3]

2. *Standard of review.* The familiar test applies. "[W]e accept the judge's subsidiary findings of fact unless they are clearly erroneous but independently review the judge's *ultimate findings* and conclusions of law" (emphasis supplied). *Commonwealth* v. *Anderson*, 461 Mass. 616, 619, cert. denied, 133 S. Ct. 433 (2012), citing *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004).

3. *Merits of review.* In this instance we must reject two of the judge's ultimate findings. First, we consider whether the Norfolk Avenue vicinity constituted a sufficiently high crime area for inclusion as a factor supporting reasonable police suspicion of the presence of a concealed weapon. We apply this factor with caution. "[W]e recognize that so-called high crime areas are

---

[2]We take the word "arrest" to mean a stop.

[3]The judge enumerated the *Sykes* facts: "[1] a high crime area, [2] a police response to a specific complaint of drug dealing among a group of ten to twenty black and Hispanic males; [3] flight from the police; [4] clenching his [suspect's] waistband while running away from the police; and [5] abandoning a bicycle after colliding with a tree."

inhabited and frequented by many law-abiding citizens who are entitled to be protected against being stopped and frisked just because of the neighborhood where they live, work, or visit." *Commonwealth* v. *Johnson*, 454 Mass. 159, 163 (2009). The court in *Johnson* nonetheless reversed a judge's suppression order on grounds, inter alia, that the uncontradicted testimony of two police officers was that the pertinent area had a history of gang activity, gun violence, and drug dealing. *Ibid.*, citing *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 42-43 (2002) (discussed *infra*). The locale alone is not sufficient justification for a stop. See, e.g., *Commonwealth* v. *Cheek*, 413 Mass. 492, 496-497 (1992); *Commonwealth* v. *Smith*, 55 Mass. App. Ct. 569, 572-573 (2002). However, evidence of its history and character may qualify it, as one criterion among several, for determination of the reasonableness of a stop.

In his subsidiary findings the judge credited Officer Anjos's account of the neighborhood's recent history: the presence of gangs, a report of a shooting two weeks earlier, and another shooting and the separate recovery of a firearm within the preceding six months. Those findings contradict the characterization of the locale as "not a high crime area or so-called 'hot spot' " and the exclusion of the neighborhood history entirely from a calculation of the reasonableness of the stop.[4]

Second, we reject the treatment of the midnight hour as "add-[ing] little if anything to the calculus of reasonable suspicion." Pertinent decisions establish the late night as a usual factor in the determination of reasonable suspicion of the presence of a firearm. See *Commonwealth* v. *DePeiza*, 449 Mass. 367, 371 (2007) ("shortly after midnight in a high crime neighborhood"); *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 43 (2002) ("at about 11:05 P.M." in "high crime area"). We add both these indicia to the factors recognized by the judge: the defendant's head movements at first sight of the police; his continuous placement of his hand inside his pants, even as he accelerated his pace; and his evasive movement away from the police.

[4]Norfolk Avenue has appeared previously in the appellate reports. It was the locale of events described in *Commonwealth* v. *Barbosa*, 457 Mass. 773, 775-776 (2010) (murder by firearm), and *Commonwealth* v. *Soto*, 45 Mass. App. Ct. 109, 110 (1998) (drug trafficking).

We agree with the judge that the moment of the *Terry*-type stop occurred as Officer Anjos opened the door of the cruiser and called, "Wait a minute." At that point, a reasonable person in the defendant's position would not feel free to leave. See *Commonwealth* v. *Stoute*, 422 Mass. 782, 786 (1996); *Commonwealth* v. *DePeiza, supra* at 369; *Commonwealth* v. *Murphy*, 63 Mass. App. Ct. 11, 17-18 (2005). As of that point, also, we weigh the aggregate circumstances supporting and detracting from a reasonable suspicion of the defendant's possession of a concealed and unlicensed firearm. The aggregation is important because, as the judge observed, "seemingly innocent activities" in combination may create the reasonable suspicion necessary for the stop and investigative inquiry. See *Commonwealth* v. *Fraser*, 410 Mass. 541, 545 (1991); *Commonwealth* v. *DePeiza, supra* at 371, and cases cited.

Two circumstances counted against reasonable suspicion. The patrolling officers had not received any information of criminal activity in the area on that night; nor did they recognize the defendant in connection to any prior criminal or gang activity. Factors supporting reasonable suspicion included Anjos's training and nine years' experience in the district, the history of firearms in the neighborhood, the late hour, the defendant's head movements, his continuous placement of his hand inside his pants, and his accelerating evasion of the police. Under the governing case law, these collective factors establish reasonable suspicion of unlawful possession of a firearm. See *Commonwealth* v. *DePeiza, supra* at 371-372 (late hour, high crime area, head movement, evasive posture blocking police observations of object in suspect's pocket, and officers' training in detection of concealed firearms); *Commonwealth* v. *Fisher, supra* at 43-46 (street encounter at late hour, area of firearms violations, suspect's walking evasion of observation by police, and his reaching to or into his waist area).[5] The police had

---

[5]At the conclusion of the suppression hearing, the judge asked the Commonwealth for its most supportive case law. The prosecutor cited specifically *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 334-336 (2007); *Commonwealth* v. *Sykes*, 449 Mass. at 314-315; *Commonwealth* v. *DePeiza, supra*; and *Commonwealth* v. *Fisher, supra*. The judge's memorandum of decision distinguishes the circumstances of *Sykes* as more supportive of reasonable suspicion. It omits entirely the other precedents.

reasonable grounds to conduct an investigative stop and frisk at the moment when the defendant turned the corner at either a walking or jogging pace. Thus, the judge should have denied the defendant's motion to suppress.

3. *Suppression hearing fact-finding process.* At the conclusion of *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 339 (2007), the court remanded the case to the motion judge for further findings necessary for informed review of a suppression order. The motion judge had left "gaps in the facts . . . material to the issues," and omitted credibility findings of the police testimony. *Id.* at 338. The court closed the decision with the following emphasis:

> "Findings of fact are factual deductions from the evidence, essential to the judgment in the case. Such findings should be stated clearly, concisely and unequivocally, and be worded so that they are not susceptible of more than one interpretation. A judge should rely on the facts derived from the evidence to reach the ultimate facts that resolve the case in light of applicable law. The judge's findings as to ultimate facts should be founded on reasonable inferences that flow logically from the evidentiary facts."

*Id.* at 339 (citations omitted).

In the present case, the judge introduced the findings with the notice that "[t]he following facts are the *only ones* found by the court based on credible testimony" (emphasis supplied). He did not explicitly discredit any testimony of the sole police witness. He omitted findings on particular, significant points of testimony. As we indicated *supra*, the findings do not specify whether the judge disbelieved the officer's testimony that the defendant had begun to jog away from the police before the stop (exit from cruiser and call to defendant), whether he did not credit the details of the officer's training about detection of concealed firearms and his representation of nine years of continuous duty in the district, or whether he did not credit the testimony that a neighborhood shooting two weeks earlier had inflicted a neck wound.

If we interpret the judge's introductory language literally, then the "only" findings resting on "credible" testimony are

his explicit statements. We would have to view other possible findings as purposefully omitted as a result of unreliable or discredited testimony.

That process impedes the work of the reviewing court and the language and purpose of *Isaiah I*. It creates an ambiguity or "gap": whether the judge overlooked a significant subsidiary finding or whether he distrusted or discredited the testimony of a police officer (often the only witness) at the suppression hearing without a straightforward statement to that effect. If the stated findings are the "only" ones supported by credible evidence, the reviewing court cannot readily add findings in order to resolve the suppression appeal. The reviewing court would need to override the introductory statement (an unwelcome possibility dependent on the record) and impose such supplementation. Finally, in cases in which the "only" findings are inadequate to resolve the suppression issues, the reviewing court will find it necessary to remand the case for further findings or evidence-taking, as it did in *Isaiah I*. That course obviously will impose substantial delay and inefficiency on the interlocutory appellate process designed to resolve determinative suppression issues expeditiously.

For these reasons, the better practice will eliminate the prefatory "only" findings statement used here. That abbreviated formulation is not the equivalent of the specific and explicit fact-finding proposed by *Isaiah I*. "Credibility determinations are for the motion judge *to make*" (emphasis supplied).[6] *Id.* at 338. The importance of the suppression decision justifies fact-finding care. Often, as here, that decision will likely determine the outcome of the case.

> *Order allowing motion to suppress reversed.*

---

[6]Credibility findings are not limited to determinations of deliberately false testimony. A judge may discredit testimony for numerous reasons of unreliability including innocent mistake, faulty or impaired perception or memory, lapse of time, distraction, and other causes.