NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1109                                          Appeals Court

COMMONWEALTH  vs.  JUAN ROSARIO-SANTIAGO.

No. 18-P-1109.

Worcester.      May 2, 2019. - October 2, 2019.

Present:  Milkey, Hanlon, & Sacks, JJ.

Controlled Substances.  Practice, Criminal, Motion to suppress.
     Search and Seizure, Probable cause, Reasonable suspicion,
     Search incident to lawful arrest, Protective frisk,
     Inventory, Impoundment of vehicle.  Constitutional Law,
     Search and seizure, Probable cause, Reasonable suspicion.
     License.  Motor Vehicle, License to operate.

Indictment found and returned in the Superior Court
Department on January 16, 2015.

A pretrial motion to suppress evidence was heard by David
Ricciardone, J., and a motion for reconsideration was heard by
him.

An application for leave to prosecute an interlocutory
appeal was allowed by David A. Lowy, J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
him to the Appeals Court.

Eduardo A. Masferrer for the defendant.
Shayna L. Woodard, Assistant District Attorney, for the
Commonwealth.

HANLON, J.  The defendant, Juan Rosario-Santiago, appeals from the denial of his motion to suppress drug and other evidence found in a "mechanical hide" and elsewhere in his motor vehicle and on his person.[1]  He argues that the arresting officer lacked probable cause to order him out of the vehicle and to pat frisk him, and that the subsequent inventory search that led to the discovery of most of the evidence at issue "exceeded the bounds of a proper inventory search and did not fall under any other exception to the warrant requirement."  We affirm, essentially for the reasons well explained by the judge.

1.  Background.[2]  We take our summary of the underlying facts from the judge's findings, supplemented by uncontested testimony at the motion to suppress hearing.  On October 9, 2014, at about 5:45 P.M., Trooper Michael Reynolds of the Massachusetts State Police was patrolling in the area of the Massachusetts Turnpike and Route 495.  Reynolds had ten years of experience as a police officer, and had completed 200 hours of

_____

[1] On February 2, 2018, the defendant filed an application for an interlocutory appeal.  The motion was allowed and the case was entered in this court on August 1, 2018.

[2] This case has been thoroughly litigated.  There was an evidentiary hearing on the motion to suppress and, afterward, the judge dictated detailed findings of fact which we summarize below.  Thereafter, defense counsel filed a motion to reconsider.  The judge heard from both counsel and reviewed written submissions; he denied the motion in a written ruling.

training in narcotics investigations.[3]  He observed a Toyota
Camry enter the roadway on Route 495 North and abruptly change
lanes.  Reynolds followed the Camry and saw it approach the
vehicle ahead of it in an aggressive manner.  The Camry then
followed that vehicle, going at least sixty-five to seventy
miles per hour at a distance of less than one car length behind.
The trooper determined that this was unsafe because, in his
view, any sudden stop by the vehicle in front would have
resulted in a rear-end collision; he had witnessed such results
"a lot of times" "as a state trooper."  He followed the Camry,
and observed it move to the center lane and continue in the same
manner.  Based upon these observations, Reynolds pulled the
Camry over and asked the defendant, who was the Camry's sole
occupant, for his license and registration; he also explained
the reason for the stop.

The defendant produced a New Hampshire driver's license and
vehicle registration and Reynolds conducted what he
characterized as a "normal conversation" that lasted
approximately two minutes.  He asked the defendant where he was
coming from and the defendant answered, "New York City."  When

---

[3] Reynolds's training included "the issuance and execution
of search warrants, dealing with confidential informants,
identifying drugs, and also finding concealed mechanical hides
in motor vehicles."

the trooper asked where, more specifically, the defendant responded, "downtown . . . [and, eventually,] . . . [s]eeing a friend." Reynolds asked what the friend's name was and the defendant first answered, "Dave." When Reynolds asked for more information about Dave, including his last name, after a delay, the defendant said, "Santiago." Throughout the exchange, the trooper noticed an unusual delay in the time that the defendant took to answer the questions. This made him suspicious, and he felt that the defendant was making up the answers. Reynolds also inquired whether the defendant had a criminal history, and the defendant responded "that he had had some trouble with the [F]ederal authorities in New Hampshire regarding drug distribution." Reynolds then went back to his cruiser to verify the defendant's information. As he was doing that, he noticed a "fast-food bag" on the rear passenger floor of the Camry; he could not see what was inside it.

When Reynolds checked the defendant's information, he discovered that the defendant had a valid New Hampshire driver's license but that his right to operate in Massachusetts was suspended. He noticed that the defendant was assigned a Massachusetts license number that began with the letter "A" (assigned for administrative purposes), "as opposed to the letter S, which the normal, active license in Massachusetts has." Reynolds confirmed the status of the defendant's

Massachusetts driver's license either through the computer in his cruiser or through information relayed to him by the dispatcher at his home barracks; he learned that the defendant's license or right to operate a motor vehicle was suspended in Massachusetts,[4] and that he had in fact been charged by the Drug Enforcement Administration (DEA) in the past "with distribution of synthetic narcotics."[5]

While waiting in his cruiser for the information to process, Reynolds observed the defendant in the Camry reach toward the back of the car in a subtle way, ostensibly in the act of yawning. The judge found that Reynolds concluded that the defendant actually "was reaching back for the [fast food] bag in the back seat." At that point, the trooper went back to the defendant's vehicle. Based upon his observations and the

---

[4] It is not entirely clear from the record whether the defendant in fact had a driver's license in Massachusetts that had been suspended or whether his right to operate in Massachusetts had been suspended.

[5] Reynolds testified that when he "ran" the defendant's information in his cruiser, he learned that the defendant had an "administrative number," indicating some issue with the status of the Massachusetts license. The judge asked him, "So did you take the next step and determine that the license was actually suspended in Massachusetts?" Reynolds responded, "Correct." On cross-examination, Reynolds clarified that he was sure that the dispatcher informed him that the defendant's Massachusetts license was suspended. In his exchange with the police dispatcher, Reynolds also learned of the defendant's Federal criminal record.

information gathered, Reynolds asked the defendant to step out of the vehicle.  He pat frisked the defendant and discovered two cell phones and keys,[6] and placed the defendant in his cruiser.[7,8] Reynolds then, pursuant to the written policy of the Massachusetts State Police, called a tow truck for the Camry. At that point, the judge concluded, "the trooper ultimately had to conclude that there was going to be a charge for operating after [license] suspension."

Before the tow truck arrived, Reynolds was required -- pursuant to the written State Police inventory policy -- to return to the defendant's car and inventory its contents. Reynolds first looked inside the fast food bag.  He discovered "a clear plastic heat-sealed packet, which was empty but had been ripped open."[9]  Also in the car was a gym bag containing

---

[6] Reynolds observed two sets of keys, one on the defendant's person and another in the ignition.  Based upon Reynolds's training and experience, he knew that vehicles used by drug couriers to transport drugs often only have the key to the vehicle in the ignition, and not the driver's house keys, for example, because the vehicles are passed from individual to individual throughout the drug courier organization.

[7] When Reynolds asked the defendant "what he was reaching for," the defendant replied that "he wasn't reaching for anything."

[8] The judge concluded that the defendant was not free to leave at this point.

[9] Reynolds believed this type of packaging indicated drug distribution because it would conceal the scent of drugs.  The heat-sealed bag was on top of the fast food wrappers within the

clothes.  Near the front seat, the trooper saw "small black elastic bands.[10]  Reynolds also noticed that, in the rear of the center console there was a "crease" in the carpet, which, based on his training and experience, he believed to have been caused by the repeated opening of a "mechanical hide."  In addition, Reynolds found a cup of urine in the center console.  Based on his training and experience, Reynolds knew that people who engage in drug distribution and, in so doing, drive long distances, often do not want to stop to use rest rooms because this gives them greater risk of exposure.[11]  There also was an "aftermarket wire" that ran from the dashboard area near the radio, trailing to the back area of the console.

After making these observations, Reynolds formally arrested the defendant, took him out of the cruiser, placed him in handcuffs, and further searched his person, discovering a "wad of money" in the process; he then placed the defendant back into

---

fast food bag.  Reynolds asked the defendant about the heat-sealed bag and the reason that it was in the vehicle, and the defendant told him he used it to wrap his sandwich.  Reynolds testified that "to [his] knowledge, there's no reason to heat-seal a sandwich."

[10] Reynolds believed these elastic bands could have been used to wrap money or drugs.

[11] Reynolds explained, "So by urinating in a cup, they don't have to stop on the side of the road and risk being stopped by the police or going to a park and ride or a rest stop area where the police often patrol and can more easily notice."

the cruiser and the Camry was towed to the State Police barracks.

Another trooper, Trooper McCammon, assisted in the search of the Camry at the barracks. McCammon was very experienced in detecting mechanical hides in vehicles, and Reynolds considered him an expert in the field. When both troopers examined the undercarriage of the Camry, they "saw a weld mark in the middle of the muffler that looked like it had been altered and lowered." "By applying power to some wires that went to the console, the troopers actually operated the mechanical hide and" discovered that the console rose up from the floor to reveal a compartment. Inside the console were several "packets of oxycodone pills that were taped up and otherwise secured with the same type of rubber bands as were found in the car."

In denying the motion to suppress, the judge ruled that "[t]he exit order was legal when the officer determined that the defendant's right to operate in Massachusetts was suspended." The judge agreed that what was initially a proper inventory search "here morphed into something beyond inventorying property." However, he concluded, essentially, that by the time that happened, the experienced trooper had probable cause to search for illegal drugs.

The defendant moved for reconsideration, arguing that the inventory search was a pretext and that the trooper in fact was

searching for drugs based upon nothing more than a hunch. The judge disagreed and denied the motion to reconsider; he concluded that, even though the trooper may have had suspicions before he began the inventory search, that fact did not detract from the conclusion that the inventory search was proper. In addition, the judge noted that there "was a legitimate safety concern born of the fact that the trooper saw the defendant reaching for the backseat bag (an act that the defendant felt he had to conceal), which provided further justification for the search here."

Discussion. "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of [his] ultimate findings and conclusions of law" (quotation omitted). Commonwealth v. Ramos, 470 Mass. 740, 742 (2015).

1. Probable cause for arrest. The defendant argues first that there was no probable cause to arrest him for operating after his license or right to operate had been suspended in Massachusetts.[12] He contends that, because he had been issued a

_____

[12] The defendant does not contest the legality of the initial stop, which he conceded at the motion to suppress hearing. See Commonwealth v. Buckley, 478 Mass. 861, 865-866 (2018) ("a stop is reasonable under art. 14 [of the Massachusetts Declaration of Rights] as long as there is a legal justification for it. We have long held that an observed traffic violation is one such justification. See Commonwealth v. Bacon, 381 Mass. 642, 644 [1980] ['Where the police have

license in New Hampshire, he was not operating illegally under the language of G. L. c. 90, § 10,[13] and, further, that the information Reynolds received from the dispatcher about his license suspension was inherently unreliable.

First, we note that at least the first portion of this argument was not made to the judge. That is, counsel offered evidence that the defendant's Massachusetts license was expired, not suspended. The judge responded, "If his license is suspended in Massachusetts, he's not supposed to be driving in Massachusetts." Counsel responded, "Suspended, yes; not expired. So the document I showed you just said that his license was expired, not suspended." The judge pointed out that the document proffered had been printed in 2016 (two years after the stop) and that "what the trooper [had] at the scene can control, even if it's incorrect."[14]

---

observed a traffic violation, they are warranted in stopping a vehicle']").

[13] General Laws c. 90, § 10, provides that "no person shall operate on the ways of the Commonwealth any motor vehicle, whether registered in this Commonwealth or elsewhere, if the registrar shall have suspended or revoked any license to operate motor vehicles issued to him under this chapter, or shall have suspended his right to operate such vehicles, and such license or right has not been restored or a new license to operate motor vehicles has not been issued to him."

[14] Defense counsel also explicitly agreed that the trooper believed that, at all times relevant, the defendant's right to operate in Massachusetts was in fact suspended.

The defendant now argues for the first time that G. L. c. 90, § 10, can be read to permit a driver whose license is suspended in Massachusetts to operate a vehicle lawfully in Massachusetts if he subsequently acquires a valid license in another State. That argument is waived as it was not made to the judge; in addition, there is no information in this record about when the defendant acquired his New Hampshire license -- that is, whether it was before or after his license or right to operate in Massachusetts was suspended. In any event, even were we to consider the argument, we are not persuaded. Such a result would appear contrary to the purpose of the law -- to prohibit those whose licenses have been suspended in Massachusetts to operate in Massachusetts without taking any action in Massachusetts to address the issue giving rise to the suspension. The defendant cites no authority, apart from his strained reading of the statute itself, for this newly raised argument.[15] Finally, as the judge observed, the issue here is what the trooper knew at the time that he made the decision to arrest the defendant. See Commonwealth v. Wilkerson, 436 Mass. 137, 140 (2002) ("Probable cause to arrest is not vitiated when

---

[15] In Commonwealth v. Ortiz, 88 Mass. App. Ct. 573, 577 n.7 (2015), this court explicitly did not decide "whether a driver whose Massachusetts license has been suspended is prohibited from driving in Massachusetts if validly licensed elsewhere."

the basis on which the police officer acted is shown after the fact to have been erroneous, because the existence of probable cause is determined 'at the moment of arrest,' not in light of subsequent events").

The defendant did argue to the judge that the information the trooper received from the dispatcher was not reliable. For authority he cited the same cases he cites to us -- Commonwealth v. Cheek, 413 Mass. 492 (1992), and Commonwealth v. Pinto, 476 Mass. 361 (2017). Neither case assists him. In Cheek, the officers stopped the defendant on the basis of a radio broadcast describing a stabbing with a very general description of a suspect. 413 Mass. at 493. When the officers could not understand the defendant's answer to their question about his name, they frisked him and recovered a firearm and, later, a quantity of marijuana. Id. at 493-494. The court concluded that "[t]he facts in [this] case fall short of constituting sufficient articulable facts on which the officers could have based a reasonable suspicion that the defendant had committed a crime." Id. at 497. In particular, the court stressed, "[w]here the police rely on a police radio call to conduct an investigatory stop, under both Federal and State law, the Commonwealth must present evidence at the hearing on the motion to suppress on the factual basis for the police radio call in order to establish its indicia of reliability." Id. at 494-495.

In the present case, the trooper did not, in fact, rely on a radio call from an anonymous source giving a general description of a suspect in an uncorroborated report of a stabbing. Instead, he reasonably relied on a report from the police dispatcher of information obtained either from the Registry of Motor Vehicles (RMV) or from State Police records after making a stop for a motor vehicle offense that he personally had observed. See Commonwealth v. Ramos, 88 Mass. App. Ct. 68, 71 (2015) ("the RMV records that formed the basis of [the officer]'s reasonable suspicion have sufficient indicia of reliability on which to predicate a traffic stop. See Wilkerson, 436 Mass. at 141-142. Indeed, RMV records are generally considered reliable. See ibid.").

In Pinto, the officers stopped the defendant's car after hearing a radio broadcast telling them to look for a described motor vehicle based upon a report of "an alleged domestic assault and battery." 476 Mass. at 362. In suppressing evidence seized as a result of the stop, the court noted that the Commonwealth had shown no basis to conclude that the person who had supplied the information conveyed in the radio broadcast either was reliable or had some basis of knowledge about the facts reported. Id. at 364-365. That case, too, is very different from the case before us. In both Cheek and Pinto, all the impetus for the defendants' encounters with the police came

from an anonymous source. Here, it is agreed that the stop was proper; the trooper then sought further information about the defendant's license status that he reasonably believed was maintained by and available to the police dispatcher.

The other cases cited by the defendant for this argument require little discussion. In Commonwealth v. Royal, 89 Mass. App. Ct. 168, 169, 170-173 (2016), this court concluded that the evidence at trial was insufficient to prove beyond a reasonable doubt that the defendant had operated a motor vehicle after his license had been suspended, because the officer's testimony about RMV records was inadmissible hearsay. Likewise, in Commonwealth v. Oyewole, 470 Mass. 1015, 1015-1016 (2014), the court concluded that the Commonwealth failed to prove its case at trial because there was no evidence that the defendant had been notified that his license had been suspended. Neither of these cases is at all helpful in deciding the case before us, where the issue is the reliability of hearsay in determining probable cause. In sum, we conclude that, once Reynolds received information from the State Police dispatcher that the defendant's license or right to operate had been suspended in Massachusetts, he had probable cause to arrest the defendant for that offense.

2. Exit order and patfrisk. The rest of the case flows naturally from that conclusion. Because there was probable

cause to arrest the defendant, the trooper was authorized to order him to get out of the car. See Commonwealth v. Greenwood, 78 Mass. App. Ct. 611, 616 (2011) ("Where police officers have a reasonable, articulable suspicion that a person in a vehicle has committed, is committing, or is about to commit a crime, they may . . . issue an exit order"). This is so, even if the officer has not yet decided whether to arrest the defendant. Cf. Commonwealth v. Blais, 428 Mass. 294, 296-297 (1998) ("The officer's actual belief as to the legal basis for his authority, however, is irrelevant, so long as the circumstances justified the action he took. See Whren v. United States, 517 U.S. 806, 813 [1996], quoting Scott v. United States, 436 U.S. 128, 138 [1978] ['the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action']; Commonwealth v. Smigliano, 427 Mass. 490, 493 [1998]").

As to the patfrisk, "[a] search incident to a custodial arrest is well established as an exception to the warrant requirement under both the Fourth Amendment [to the United States Constitution] and art. 14 [of the Massachusetts Declaration of Rights]. See United States v. Edwards, 415 U.S. 800, 802 (1974), and cases cited; Commonwealth v. Santiago, 410

Mass. 737, 742-743 (1991), and cases cited. Under both Fourth Amendment and art. 14 jurisprudence, the purpose of the search incident to arrest exception is twofold: (1) to prevent the destruction or concealing of evidence of the crime for which the police have probable cause to arrest; and (2) to strip the arrestee of weapons that could be used to resist arrest or facilitate escape. See Chimel v. California, 395 U.S. 752, 762-763 (1969); Santiago, supra at 743." Commonwealth v. Mauricio, 477 Mass. 588, 592 (2017). Moreover, "[t]he fact that a search preceded a formal arrest is not important, 'as long as probable cause [to arrest] existed independent of the results of the search.'" Commonwealth v. Johnson, 413 Mass. 598, 602 (1992), quoting Santiago, supra at 742. See Commonwealth v. Sweezey, 50 Mass. App. Ct. 48, 53 (2000), quoting Commonwealth v. Mantinez, 44 Mass. App. Ct. 513, 517-518 (1998) ("Probable cause for an arrest, even if not acted upon by a formal arrest, brings with it the 'search incident to arrest' exception to the warrant requirement for a search").[16]

3. Towing the car. Given the license suspension, whether or not the trooper in fact intended to arrest the defendant

---

[16] However, "the search and the arrest 'must be roughly contemporaneous.' Commonwealth v. Washington, 449 Mass. 476, 481 (2007)." Commonwealth v. Craan, 469 Mass. 24, 29 (2014). The defendant does not argue that that requirement was violated here.

rather than summons him later, he could not reasonably permit the defendant to drive the car away. Nor could he leave the car on the side of Route 495 at approximately 6 P.M. in the evening. Therefore, it is clear that the trooper was obliged to have the vehicle towed from the side of the highway, pursuant to the written tow policy of the State Police, which was admitted in evidence.[17] See Commonwealth v. Davis, 481 Mass. 210, 218 (2019), where the court agreed that the police had reasonable grounds to impound (and tow) the defendant's vehicle that was "stopped on the left hand side of a toll exit on the Massachusetts Turnpike, in the middle of the day."

4. Inventory search. The inventory search also was proper. In these circumstances, such searches serve legitimate interests, including "protecting the arrestee's property, protecting the police from false claims of theft, and public safety." Commonwealth v. Vanya V., 75 Mass. App. Ct. 370, 374 (2009). "Although a well-established exception to the warrant requirement, an inventory search must hew closely to written police procedures and may not conceal an investigatory motive. See South Dakota v. Opperman, 428 U.S. 364, 376 (1976);

---

[17] "Officers are authorized to remove (or cause to be removed) any vehicle found upon a road/state highway when . . . [t]he operator of the vehicle is arrested and the vehicle would be left unattended on a public way." Department of State Police General Order TRF-09 (December 10, 2007).

Commonwealth v. Rostad, 410 Mass. 618, 620 (1991). The lawfulness of an inventory search turns on the threshold propriety of the vehicle's impoundment, and the Commonwealth bears the burden of proving the constitutionality of both. See Commonwealth v. Eddington, 459 Mass. 102, 108 (2011); Commonwealth v. Ellerbe, 430 Mass. 769, 772-774 (2000)." Commonwealth v. Ehiabhi, 478 Mass. 154, 164-165 (2017).

As required, the trooper's inventory followed the written policy of the State Police, which also was admitted in evidence.[18] As this court noted in Commonwealth v. Silva, 61 Mass. App. Ct. 28, 35 (2004), "[i]n considering whether the government has met [its] burden of proof [as to the legality of the search], the written inventory policy is the best evidence."

---

[18] "Any vehicle ordered towed . . . shall be inventoried and properly documented . . . . The Department shall inventory any vehicle ordered towed, removed, or impounded . . . pursuant to a lawful arrest when the vehicle would be left unattended . . . . The standard inventory procedure shall consist of a detailed inspection of the interior and exterior of the vehicle for damaged and missing parts, as well as to locate and record the contents of the vehicle. The following areas shall be inventoried: The interior of the vehicle; [t]he glove compartment and trunk (unless they are locked and there is no key available); and [t]he exterior of the vehicle for missing or damaged parts. The inventory listing of personal items and valuables shall extend to all storage areas and compartments that are accessible to the operator or occupants. . . . All closed but unlocked containers shall be opened, and each article inventoried individually" (emphasis added). Department of State Police General Order TRF-10 (April 23, 2009).

The defendant contends, however, that the purpose of the inventory was investigative, not administrative (i.e., not to obtain an inventory), because the trooper first opened a paper fast food bag in the rear of the vehicle and also opened a paper cup (found to contain urine) because he had seen people "put stuff inside a cup before," including, specifically, drugs. This argument fails for several reasons. First, the policy clearly instructs the trooper to open all closed but unlocked containers; this would include both a bag, even one that looked like trash, and a paper cup. The fact that he did those things first, rather than open the glove compartment, cannot be dispositive; the policy required that he do them at some point during the inventory. Nor did the judge find (or the defendant argue) that the trooper spent any longer looking into the bag and the cup than was necessary to determine their contents.

Second, the fact that the trooper might also have had suspicions that the defendant was involved in drug trafficking does not invalidate the validity of the inventory search, otherwise justified and properly conducted. See Commonwealth v. Horton, 63 Mass. App. Ct. 571, 577 (2005) ("Even the fact that the police might have suspected that the inventory search could turn up more weapons does not make it an impermissible pretext search. See Commonwealth v. Garcia, 409 Mass. 675, 679 [1991], and cases cited").

The facts in Commonwealth v. Ortiz, 88 Mass. App. Ct. 573 (2015), on which the defendant heavily relies, are very different. In Ortiz, the motion judge found that the defendant was targeted in advance; he was the subject of a DEA investigation into drug trafficking. Id. at 574. The DEA agents had learned that the defendant's license to operate had been suspended and later, when they also had information that he would be transporting a kilogram of cocaine, they contacted the State Police and asked to have a uniformed trooper stop and arrest "the defendant as a pretext to conduct a search for investigative purposes," i.e., "with the expectation that impoundment and an inventory search of the defendant's motor vehicle would follow." Id. at 574.

"The judge found that but for these explicit instructions, [the arresting trooper] 'would not have stopped [the defendant] for changing lanes' and 'that in other circumstances he would not arrest someone for operating a motor vehicle with a suspended license.'" Id. at 575. This court affirmed the motion judge's decision to suppress the drugs seized during the search. We recognized that " '[t]he fact that the searching officer may have harbored a suspicion that evidence of criminal activity might be uncovered as a result of the search should not vitiate his obligation to conduct the inventory.' Commonwealth v. Tisserand, 5 Mass. App. Ct. 383, 386-387 (1977). However,

'an inventory search [will] not be upheld if . . . there [is] a "suggestion . . . that this standard procedure" [is] a pretext concealing an investigatory police motive.'  Ibid., quoting from South Dakota v. Opperman, 428 U.S. 364, 376 (1976)."  Ortiz, 88 Mass. App. Ct. at 576.

In the present case, by contrast, the judge concluded explicitly that the search was not pretextual.  "We entrust credibility determinations to the motion judge, Commonwealth v. Yesilciman, 406 Mass. 736, 743 (1990), and discern no error in [his] finding that the inventory search was not a pretext."  Ehiabhi, 478 Mass. at 166.  See Davis, 481 Mass. at 218 ("Commonwealth v. Hoose, 467 Mass. 395, 399-400 [2014] [court defers to motion judge's subsidiary findings of fact absent clear error]").

5.  Probable cause to search:  automobile exception.  The judge determined, appropriately in our view, that when the trooper looked underneath the dashboard to see if he could observe a wire leading to a hidden compartment, the vehicle search "morphed into something beyond inventorying property."  The judge found that the trooper's decision to do so was supported by the following information, which the trooper knew at that point:

> "the defendant was driving fast and erratic; he seemed
> to be making up answers as he went along in response
> to early, routine questions; the defendant . . . had

> surreptitiously reached [toward] the bag in the back
> seat and then denied it; there was an open heat-sealed
> baggie in the fast food bag . . .; the defendant had
> evidently urinated in a cup rather than stop; and
> there [were] . . . elastics of the type used to bind
> cash and drugs.  All of these things spelled 'hidden
> compartment' to the experienced trooper even though
> any one of the factors may not have spelled illegal
> activity."

In addition, the trooper had noticed wear marks in the Camry's carpet that, he knew, based upon his training, were consistent with a hidden compartment, or "hide."  These marks were in plain view.  See Commonwealth v. Santana, 420 Mass. 205, 211 (1995) ("'Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'  Minnesota v. Dickerson, 508 U.S. 366, 375 [1993]").  See also Commonwealth v. Goncalves, 62 Mass. App. Ct. 153, 157 (2004).

Given everything he knew, the trooper had probable cause at that point to search the car for drugs and other evidence of drug trafficking (including a wire leading to a hide), an automobile search that clearly fell within a recognized exception to the warrant requirement.  See Davis, 481 Mass. at 220 ("Due to the inherent mobility of an automobile, and the owner's reduced expectation of privacy when stopped on a public road, police are permitted to search a vehicle based upon

probable cause to believe that it contains evidence of a crime"). In Davis, the court determined that the introduction of a drug sniffing dog converted the inventory search into an investigatory one, id. at 219-220; however, the search of the glove compartment was upheld because the officer had probable cause to believe that it contained evidence of a crime. Id. at 221-222. So, too, here, armed with probable cause to search for drug evidence, the troopers properly searched the car, including for a wire leading to the hidden compartment and then the compartment itself.

Again, the cases cited by the defendant are distinguishable and therefore do not assist him. In Mauricio, 477 Mass. at 595-596, the court upheld an inventory search of the defendant's backpack, ruling that a ring discovered in that search was properly seized. It was only the further search of the digital images on a camera that the court deemed unreasonable because the purpose of that search was admittedly investigatory, that is, to discover the "true owner" of the camera, which the police officers believed to have been stolen.

Commonwealth v. White, 469 Mass. 96, 100-102 (2014), involved a search incident to an arrest on an outstanding warrant and the seizure of a container of pills from the defendant's person. The court concluded that although the container could be opened pursuant to the police department's

inventory policy, id. at 101, the incriminating nature of the pills was not immediately apparent and was, in fact, only discovered through a subsequent computer search "in an attempt to identify the pills," id. at 98, which "transformed a lawful inventory seizure of the pills into an unlawful investigatory search of the pills." Id. at 102.

Nor does Commonwealth v. Vuthy Seng, 436 Mass. 537, cert. denied, 527 U.S. 942 (2002), compel a different result. In Vuthy Seng, when the defendant was booked, his property was inventoried and a bank card was removed from his wallet. Id. at 548. The officers not only noted the information on the front of the card, but recorded the account numbers on the back. Id. at 548-549. The court distinguished between the two observations, and explained the distinction: "Applying the principles distinguishing an inventory from an investigative search to the facts before us, the information on the front of the bank card, that it is a Shawmut bank card, declares its nature to anyone at sight. The account numbers written on the back of the card are not as obvious and would not be recalled simply from a permissible inventory viewing. 'What the police may not do is hunt for information by sifting and reading materials taken from an arrestee which do not so declare themselves.' [Commonwealth v. Sullo, 26 Mass. App. Ct. 766,] 770 [(1989)]. Nor would there be any need for the police to

record the account numbers on an inventory list, given that this particular card was of no value. . . . Recording this information would not serve any of the generally accepted objectives of an inventory search preceding incarceration." Id. at 553-554. In the present case, because the incriminating nature of the wear marks in the carpet was immediately apparent to the trooper, given his expertise and his other observations, it is proper to include that observation in our calculus about whether there was probable cause to conduct a further search.

Finally, in Commonwealth v. Muckle, 61 Mass. App. Ct. 678, 683 (2004), we found the search unreasonable because the inventory policy at issue "requiring that the passenger area of a vehicle be 'thoroughly examined' and all personal property be removed and secured at the police station" did not provide specifically that containers be opened. In so doing, we said, "[w]hile we recognize that valuables may be secreted virtually anywhere, a bag of trash is not a customary storage area for valuables. Even were we to accept the premise that because a bag of refuse might contain valuables it should permissibly be inventoried along with other items, a bag of refuse that must be 'opened' for its contents to be visible is like any other unlocked closed container. . . . What is important is whether the item constitutes a closed container capable of holding personal property of value. Even broadly read, the Bridgewater

police department's inventory policy fails to require the police to open closed containers" (emphasis added).  Id. at 683-684.

In the present case, of course, the State Police policy explicitly did require the opening of a closed but unlocked container and, as we observed in Muckle, "[w]e emphasize that we are not concerned with whether, consonant with Federal and State constitutional requirements, police may open closed but unlocked containers in conducting an inventory search.  Clearly, police may do so, provided the written inventory policy requires them to do so" (emphasis added).  61 Mass. App. Ct. at 684.

We conclude that the motion to suppress was properly denied.

Order denying motion to
suppress affirmed.

Order denying motion to
reconsider affirmed.

MILKEY, J. (dissenting).  During the evening rush hour on Route 495, Trooper Michael Reynolds pulled the defendant over for driving too closely to the car in front of him (a practice commonly known as "tailgating").  Fresh off a training on the concealment of illegal drugs in cars, Reynolds embraced the opportunity to put his newly-honed skills to work.[1]  What began as the most routine of traffic stops, progressed into a full-scale investigatory search of the defendant's car.  Through Reynolds's enterprising efforts, the State Police eventually discovered underneath the car's center console a well-hidden compartment in which an unspecified number of oxycodone pills were secreted.  Because I believe the escalation of the routine traffic stop here crossed constitutional bounds, I respectfully dissent.

From the outset, I want to highlight that I agree with most of the majority's subsidiary holdings, including that the stop, exit order, and patfrisk here all were valid, that the defendant's car had to be towed, and that an inventorying of the car's contents was warranted.  For the reasons that follow, however, I believe that the judge erred as a matter of law in determining the point at which an investigatory search of the

_____

[1] Reynolds attended that training the day before the traffic stop.  He previously had received extensive other training in narcotics enforcement, and for many years had been engaged in such enforcement as a local police officer.

car began.  Because there was not probable cause at that earlier point in time, I would reverse the order denying the motion to suppress.

Background.[2]  Immediately after he approached the defendant's stopped car, Reynolds made the customary request that the defendant present his license and registration.  The defendant obliged by producing the requested documents, both of which had been issued by the State of New Hampshire (where the defendant currently resided).  Before returning to his cruiser to "run" these documents, Reynolds proceeded to ask the defendant a series of questions.  Although this questioning lasted only approximately two minutes, the questions themselves were markedly pointed, and -- as Reynolds acknowledged -- they were designed "to verify that everything is normal." Specifically, Reynolds serially posed the following queries to the defendant:  where was he coming from, where specifically in New York City (the Bronx) was that, what was he doing there, what was the name of the friend he was visiting, what was the last name of that friend, how long had he been there, what was the specific purpose of the trip, and where was he now traveling to.  According to Reynolds, although the defendant was

---

[2] The factual recitation that follows is drawn from the judge's findings, supplemented by uncontested testimony that the judge explicitly or implicitly credited.  See Commonwealth v. Lopez, 458 Mass. 383, 384-385 (2010).

"relatively calm" in responding to these questions, his demeanor seemed "slightly confrontational," with "an edge," and "agitated."[3]  Reynolds considered the defendant's individual responses "nondescript" and delayed.[4]  This aroused his suspicion.  Adding to that suspicion was the fact that the defendant had admitted to having come from New York City, which Reynolds viewed as a "source city" for narcotics.

Because "things seem[ed] off," Reynolds proceeded to ask the defendant if he ever had been in trouble with the police. The defendant responded that he previously "had been charged with trafficking in pills" in New Hampshire, but had "been in little to no trouble in the state of Massachusetts."  At that point, Reynolds "went back to [his] cruiser to run [the defendant's license and registration] and to further corroborate or investigate his criminal history that he spoke of."  On his way to the cruiser he performed a quick visual scan of the defendant's car, spotting a discarded fast food bag on the floor of the rear seat.

---

[3] In explaining that the defendant seemed "agitated," Reynolds alluded to the fact that the defendant appeared to be recording their conversation on his cell phone.

[4] Reynolds acknowledged that the defendant spoke with an accent, but believed that he had a sufficient command of English that this was not the cause of his delayed responses.

Back at his cruiser, Reynolds confirmed through a dispatcher that the license that the defendant provided was valid, and that the defendant did in fact have a criminal record that included a charge by the Drug Enforcement Administration (DEA) for "distribution of synthetic narcotics." However, according to Reynolds's account of what an unidentified dispatcher told him, the defendant's right to drive in Massachusetts was currently under suspension, which Reynolds understood to be the result of the defendant's having not paid traffic tickets incurred in Massachusetts.[5] See G. L. c. 90C, § 3(6) (requiring that operators who do not pay traffic tickets have their licenses or right to operate in Massachusetts "suspended by operation of law and without further notice"). As Reynolds ran the defendant's information, he observed the defendant appear to yawn and then reach back toward the rear seat of the car.

Once back at the defendant's car, Reynolds ordered the defendant out of the car and pat frisked him. Through the

---

[5] In his initial testimony, Reynolds could not recall whether he learned this information from a dispatcher or had logged onto the computerized recordkeeping system himself. However, he later clarified that he was sure it was a dispatcher who told him this information. In delivering his oral findings from the bench, the judge initially stated that Reynolds learned the information from one of these two methods. After defense counsel reminded the judge of Reynolds's later clarifying testimony, the judge stated, "All right. I'll adopt that finding."

patfrisk, Reynolds found two cell phones on the defendant's person and a set of keys in his pocket (separate from the key in the ignition). Reynolds asked the defendant about his seeming to reach into the rear seat, which the defendant denied doing. At that point, Reynolds had not yet decided whether he was going to arrest the defendant for driving while his right to operate on Massachusetts roads was under suspension. However, Reynolds understood that in any event, the defendant could not drive his vehicle from the scene because of the suspension. Reynolds proceeded to detain the defendant in the back seat of his cruiser while he searched the defendant's car.

In conducting that search, Reynolds examined first the rear seat area toward which he believed he had seen the defendant reach. He went through the discarded fast food bag that he previously had spotted on the floor there. In Reynolds's view, drug traffickers "don't want to stop anywhere for long periods of time," and patronage of fast food restaurants by those on highways itself was an "indicator" of drug trafficking. Inside the bag, Reynolds found -- amongst "other wrappers in there from fast food, items . . . like from the French fries or cheeseburger or whatever" -- an empty plastic bag bearing a Ziploc brand logo. According to Reynolds, this was a "heat-sealed" bag of the sort used "for packaging up food and freezing

it and stuff like that."[6]  Reynolds nonetheless found the presence of the empty bag significant, because he knew from his training and experience that drug dealers sometimes stored drugs in such bags in an effort to prevent "narcotics detection canines" from picking up the scent.  Reynolds asked the defendant about the discarded plastic bag, and the defendant responded that he had used it to store his sandwich.  Reynolds found this explanation implausible, because -- in his words -- "to my knowledge, there's no reason to heat-seal a sandwich." On the rear seat, Reynolds also found a gym bag with clothes in it that apparently had no inculpatory import.

Turning to the front area of the car, Reynolds found a number of small rubber bands on the front passenger seat floor that he concluded were "consistent with those used for packaging up money, sometimes drugs."  He also spotted a fast food cup that had a lid on it.  According to Reynolds, he decided to look inside the cup in order to see if narcotics were hidden inside it.  He discovered instead that the cup contained urine. Reynolds viewed this as a further indicator that the defendant

---

[6] In fact, a photograph admitted in evidence reveals lettering on the bag that denotes it as a "Ziploc vacuum sealer" bag, not a heat-sealed one.  Although Reynolds may have misspoken in referring to it as a heat-sealed bag, his larger point that the bag is of a sort designed to prevent its contents from being exposed to air stands.

was engaged in a concerted effort to minimize having to stop along his journey back from a "source city."

While searching the front of the defendant's car, Reynolds paid particular attention to the center console area because he knew from his training that this area is "a common place for hidden compartments to be." Proceeding in this fashion, he discovered that the edge of the carpeting where it met the rear of the center console appeared to be worn. This was something he specifically had been taught to look for, because such wear marks could be a sign that the center console had been moved in and out over time to gain access to a concealed "hide" in that area. Reynolds then began to conduct a search for after-market wiring, another potential indicator of a drug hide. This involved looking up underneath the dashboard area, as well as lifting up and "peek[ing]" under the plastic that ran along the floorboard of the console. Finding the presence of such wiring, Reynolds decided to arrest the defendant for driving while his right to operate on Massachusetts roads was suspended.

In order to continue his search of the defendant's car, Reynolds had it towed to State police barracks instead of the tow yard. To assist him in that search, Reynolds called in another trooper who had even more experience than he did in the discovery of drug hides. Together, the troopers examined the underside of the car, where they discovered that the muffler had

been altered in a manner that would have allowed room for a secret compartment to be placed under the center console. They eventually found such a compartment that could be accessed through a hydraulic system. The troopers were able to apply power to override the complicated hide system, which raised up the center console and revealed an after-market box beneath it containing oxycodone pills.

Based on this discovery, the defendant was indicted for trafficking in between thirty-six and one hundred grams of "opium or any derivative thereof." G. L. c. 94C, § 32E (c). The fate of the separate charge for which the defendant initially was arrested (operating a motor vehicle in Massachusetts while his right to do so was under suspension) is not clear. There is nothing in the record to suggest that the defendant ever was cited for tailgating, the original infraction for which he had been stopped.

Discussion. As the judge properly concluded, Reynolds's search of the defendant's car plainly exceeded the spatial bounds of the State Police inventory search policy once he began hunting for after-market wiring. The judge concluded, however, that at that point, probable cause had been established by Reynolds's finding numerous indicia he had been trained to look for. For purposes of my analysis, I assume arguendo that the sum total of the observations Reynolds had made by the time he

began looking up under the dashboard -- however innocent each alone might be -- amounted to probable cause. Commonwealth v. Santaliz, 413 Mass. 238, 242 (1992) (innocent details "disclosed to the eyes of an experienced narcotics investigator" can add up to probable cause of illegal narcotics activity). However, for the reasons explained below, I believe an investigatory search began at an earlier point in time when probable cause did not yet exist.

With Reynolds personally having observed the defendant driving too closely to the car in front of him, the initial traffic stop itself plainly was valid. Commonwealth v. Buckley, 478 Mass. 861, 865-866 (2018), citing Commonwealth v. Bacon, 381 Mass. 642, 644 (1980). However, virtually from the moment Reynolds first encountered the defendant face-to-face, his focus was on investigating potential drug trafficking, not on completing an ordinary traffic stop. I do not mean to suggest that an officer who has stopped a car for a civil traffic infraction must immediately run the license and registration presented to him; although that might be the more prudent practice, a traffic officer's engaging in some amount of conversation before doing so is not constitutionally proscribed. But here, Reynolds developed an almost immediate hunch that the defendant might be involved in nefarious activity, and -- without reasonable suspicion -- he employed his pointed

questioning of the defendant toward building a case.[7]  In my view, such questioning, while relatively brief, was unwarranted. See Commonwealth v. Cordero, 477 Mass. 237, 241-247 (2017) (addressing permissible bounds of routine traffic stop and under what circumstances such stop may be extended).[8]

Of course, unlike Cordero, this is not a case where a driver was long detained after the traffic stop was complete. In Cordero, the officer's check of the driver's license and registration revealed no infirmities, whereas here, Reynolds was told by a dispatcher that the defendant's right to operate on Massachusetts roads currently was under suspension.  477 Mass. at 242-243.  Although the Commonwealth presented no documentation corroborating that such a suspension in fact was in effect,[9] I accept arguendo the majority's conclusion that it

_____

[7] Nothing in this dissent should be read as suggesting that I believe Reynolds was acting in bad faith.  It is evident that he was trying to fulfill his mission of uncovering criminal activity, and he showed great initiative and skill in doing so.

[8] In Cordero, a trooper's suspicions were aroused in very similar circumstances:  the driver was from what the trooper considered a "source city," he was providing seemingly evasive answers to the trooper's questions, and he had a record that included drug-related crimes.  477 Mass. at 239, 244-246. Nevertheless, the court concluded that such factors did not constitute reasonable suspicion necessary to detain the defendant.

[9] The evidentiary record on this point is murky at best. The defendant himself provided some Registry of Motor Vehicle records, which the judge admitted in evidence.  Those records showed that the defendant once had a Massachusetts license that

was reasonable for Reynolds to rely on what the police dispatcher had told him and that his reasonable belief was sufficient for present purposes.  Compare Commonwealth v. Wilkerson, 436 Mass. 137, 140-141 (2002) (probable cause to arrest not vitiated by fact that police were relying on erroneous information obtained from Registry of Motor Vehicles records that defendant's license had been revoked), with Commonwealth v. Maingrette, 86 Mass. App. Ct. 691, 694-700 (2014) (firearm found on defendant when he was arrested suppressed where police mistakenly believed there was outstanding arrest warrant and police would have learned that this was mistaken had they followed department policy).

I agree with the majority that the actions Reynolds took after being told of the suspension were, in large measure, warranted.  Like the majority, I do not accept the defendant's argument that his acquiring an out-of-state license allowed him to drive in Massachusetts even if his right to drive on

---

expired in 2009, and that he subsequently incurred two traffic tickets (one for speeding and one for excessive window tinting). The records do not note whether he paid the assessed fines or whether his right to drive had been suspended as a result of nonpayment of them.  As Reynolds himself acknowledged, the fact that a driver like the defendant had been assigned an "A" license number does not by itself mean that there had been a suspension of his license or right to drive on Massachusetts roads.  There is nothing in the record to suggest that Reynolds ever asked the defendant whether his right to drive on Massachusetts roads was under suspension.

Massachusetts roads had been suspended.[10]  Having learned of the suspension, Reynolds could not let the defendant drive the car regardless of whether he arrested the defendant for already having done so.[11]  In addition, there being no alternative driver present, Reynolds was justified in concluding that the car needed to be towed from the side of the busy highway.  With the car needing to be towed, Reynolds was further justified in ordering the defendant to get out of the car, see Commonwealth v. Cruz, 459 Mass. 459, 466-467 (2011) (discussing when exit orders are permissible), and I agree with the majority that where Reynolds had seen the defendant reach toward the rear

---

[10] That said, the defendant's argument that the language of the statute provides support for that curious result is stronger than the majority credits.  See G. L. c. 90, § 10 (criminalizing operation of motor vehicle in Massachusetts if driver's license or right to operate in Massachusetts has been suspended "and such license or right has not been restored or a new license to operate motor vehicles has not been issued to him").

[11] As noted, Reynolds believed the defendant's right to drive in Massachusetts was suspended for being delinquent in paying traffic tickets.  See G. L. c. 90C, § 3(6).  I do not question the validity of such a means of trying to ensure that assessed fines are paid (although I recognize that this may result in disproportionate impacts on people of limited economic means).  However, it still bears noting that any suspension here appears to have been a result of that collection mechanism, not because the defendant had been adjudicated a menace on the roads.  Moreover, I note that whether the defendant had actual notice that his right to drive had been suspended is not addressed by the current record.

seat, a patfrisk also was justified for officer safety.  See

Commonwealth v. Stampley, 437 Mass. 323, 325-329 (2002).[12]

Most significantly, I agree with the majority that, in advance of the tow, an inventorying of the defendant's car was warranted pursuant to the written State Police inventory search policy in order to safeguard any belongings inside.  See Commonwealth v. Abdallah, 475 Mass. 47, 51 (2016), quoting Commonwealth v. Vuthy Seng, 436 Mass. 537, 550-551, cert. denied, 537 U.S. 942 (2002) ("An inventory search conducted by police officers pursuant to a police department's written policy is 'justified to safeguard the defendant's property, protect the police against later claims of theft or lost property, and keep weapons and contraband from the prison population'").  However, the fact that an inventorying of the car's contents was warranted does not end the inquiry.

The inventory search policy applicable here is decidedly expansive in scope.  For example, that policy requires an inventorying of "[t]he interior of the vehicle," it encompasses "[a]ll open areas, including the floor areas, the area in and around the instrument panel and the rear deck above the rear

---

[12] But see Commonwealth v. Hooker, 52 Mass. App. Ct. 683, 687 (2001) (observation made during traffic stop that occupant of car "appeared to place something on the seat is neither indicative of criminality nor a ground for reasonable apprehension").

passenger seat, the open area under the seats, the glove compartment and trunk,[13] and other places where property is likely to be kept," and it requires that "[a]ll closed but unlocked containers shall be opened, and each article [inside] inventoried individually."  Department of State Police General Order TRF-10 (April 23, 2009).  In light of this breadth, it is unsurprising that the judge concluded that Reynolds did not exceed the spatial bounds of that policy until he started to hunt for after-market wiring outside the physical confines of the passenger compartment.  That assessment appears correct.  However, it does not thereby follow that -- in the shorthand employed by the judge -- "the inventory policy allowed the trooper to search throughout the vehicle."  Put differently, the fact that an officer purporting to conduct an inventorying of a car's contents may not have violated the express terms of a broadly-crafted administrative inventory search policy does not mean that constitutional norms have been satisfied as to how that search actually was conducted.[14]

---

[13] The glove compartment and trunk need not be inventoried if they are locked and no key is available.

[14] In my view, the term "inventory search" is a misnomer that beckons for abuse.  It wrongly suggests that the inventorying of a car's contents should be thought of as being just like other types of searches, just with a different legal justification.  Although I recognize that appellate courts commonly use the phrase "inventory search," I have avoided using

First principles bear remembering.  Warrantless searches of private property are presumptively unconstitutional under both the Federal and State Constitutions.  <u>Commonwealth</u> v. <u>Antobenedetto</u>, 366 Mass. 51, 57 (1974).  Although the cases have long recognized that search warrants generally need not be obtained for searches of motor vehicles,[15] the police still may not conduct investigatory searches of them absent probable cause to believe that the vehicle contains evidence of a crime.  <u>Commonwealth</u> v. <u>Motta</u>, 424 Mass. 117, 123-124 (1997).  Exceptions allowing for noninvestigatory searches are to be narrowly construed, and where such an exception is claimed, "the burden rests with the Commonwealth to demonstrate that the search 'was conducted for some legitimate police purpose other than a search for evidence.'"  <u>Buckley</u>, 478 Mass. at 872, quoting <u>Commonwealth</u> v. <u>Benoit</u>, 382 Mass. 210, 219 (1981), <u>S.C.</u>, 389 Mass. 411 (1983).  In this context, that is, where the Commonwealth is seeking to justify a search without probable

---

it here to the extent feasible, employing instead the term "inventorying."

[15] Such an exception is based on the inherent mobility of motor vehicles.  Under the cases, this "automobile exception" applies even where the vehicle has been impounded, so long as the search takes place relatively soon after the impoundment has incurred.  Compare <u>Commonwealth</u> v. <u>Bongarzone</u>, 390 Mass. 326, 350-351 (1983) (no warrant needed where car was searched "less than two hours" after impoundment), with <u>Commonwealth</u> v. <u>Agosto</u>, 428 Mass. 31, 34-35 (1998) (warrant required for additional searches conducted "over a span of twenty-one days").

cause, "consideration of an officer's 'purpose' for conducting the search is relevant to an assessment of the lawfulness of the search itself."  Buckley, 478 Mass. at 872 & n.15.[16]

The cases establish that where the police searched a defendant's possessions absent probable cause, it is not enough for the Commonwealth to prove that an inventorying of those possessions was warranted.  That is because "[t]he inventory search exception to the search warrant requirement is strictly limited to the purposes underlying that exception." Commonwealth v. Murphy, 63 Mass. App. Ct. 11, 17 (2005), citing Vuthy Seng, 436 Mass. at 554 n.16.  This principle is well illustrated by our seminal decision in Commonwealth v. Sullo, 26 Mass. App. Ct. 766 (1989).[17]  In that case, the police arrested the defendant for outstanding warrants related to traffic violations.  Id. at 767.  At booking, the arresting officer discovered large amounts of cash in the defendant's pockets, together with multiple business cards and a folded piece of

_____

[16] As the Buckley court explained, although the validity of a traffic stop itself is assessed without attention to "the actual motivations of the officer involved" (quotation and citation omitted), this principle does not apply to assessing whether a purported noninvestigatory search arising out of that stop amounted to a search for evidence, thereby requiring probable cause.  Buckley, 478 Mass. at 872 n.15.

[17] The Supreme Judicial Court repeatedly has cited to Sullo and relied on its reasoning, including recently.  See Commonwealth v. Mauricio, 477 Mass. 588, 595-596 (2017).

paper. Id. With his interest piqued by the cash, the officer closely examined the cards and paper, which were annotated with initials, figures, and mathematical symbols. Id. at 767, 772. The arresting officer discerned the paper to be a "cuff sheet" related to illegal gambling, and the defendant was charged with a gaming violation. Id. at 767, 768. The Commonwealth defended its examination of the cards and papers "as a legitimate part of an inventory search" of the defendant's person. Id. at 768. Apparently on that basis, a District Court judge denied the defendant's motion to suppress that evidence.

In an opinion authored by Justice Kaplan, we reversed. Id. at 772. We emphasized that an inventory search "is carefully circumscribed by law because, as an exception to the ordinary constitutional requirements, the search may be conducted without warrant or probable cause." Id. at 768. To pass muster, however, an inventory search must satisfy three criteria: "First, the search must follow a standard or routine procedure adopted and recognized by the police force. Second, it may not extend beyond the custodial necessities which are its sole justification. Third, it may not become a cover or pretext for an investigative search." Id. We also observed that "[i]n making an inventory -- taking from the person, noting what is received, and placing it in safekeeping -- the police are to act more or less mechanically, according to a set routine, for to

allow then a range of discretion in going about a warrantless search would be to invite conduct which by design or otherwise would subvert constitutional requirements." Id. at 772. Applying those principles, we concluded that the officer in Sullo was not mechanically cataloguing the contents taken for safekeeping, but instead was following the lead provided by the large amounts of cash found in the defendant's pockets. Id. Accordingly, we held that "[t]he Commonwealth ha[d] not carried its burden of establishing that this was a lawful inventory search." Id. Significantly, in reaching such conclusions, we expressly relied in part on the judge's description of how the officer's suspicions animated his follow up perusal of the defendant's property. Id.

In the three decades since Sullo was published, the Supreme Judicial Court has adopted and consistently applied the same principles. In Vuthy Seng, the court directly addressed the extent to which police could obtain evidence through scrutinizing an item being inventoried, specifically, a bank card found on the defendant's person. 436 Mass. at 550-555. The court concluded that the police could use the bank logo appearing on the front of the card, because "police need not 'blind themselves' to obvious facts," that is, to information that "declares its nature to anyone at sight." Id. at 551-552 & n.12, 553, quoting Sullo, 26 Mass. App. Ct. at 770. However,

the court concluded that the account numbers appearing on the bank card must be suppressed where that information was "not as obvious and would not be recalled simply from a permissible inventory viewing." Vuthy Seng, supra at 553. Vuthy Seng thus firmly establishes that observations made during the inventorying of a defendant's possessions cannot be justified as the product of an inventory search where such evidence was gleaned from applying a level of scrutiny that exceeded custodial ends.

In Commonwealth v. Blevines, 438 Mass. 604, 608-610 (2003), the court ruled that -- although the police properly seized keys from a defendant's pocket that potentially could be used as weapons -- "detailed scrutiny of the keys" amounted to an investigatory search that required probable cause and a warrant.[18] Similarly, in Commonwealth v. White, 469 Mass. 96, 102 (2014), the court concluded that once the police closely examined pills that lawfully had been seized from a defendant and used "the number imprinted on the pills to identify them," such use "transformed a lawful inventory seizure of the pills into an unlawful investigatory search of the pills." Finally, the court recently held that although police properly took

---

[18] Accord Murphy, 63 Mass. App. Ct. at 14-16 (detailed observation of keys properly seized from defendant "improperly transformed an inventory search of [defendant's] person into an investigatory search").

possession of a digital camera found in a backpack during an inventory search, they could not examine the contents of the camera without a warrant. Commonwealth v. Mauricio, 477 Mass. 588, 595-596 (2017), citing Vuthy Seng, 436 Mass. at 550-553; Sullo, 26 Mass. App. Ct. at 770. The court reasoned that the police's examination of the contents of the camera was not "a benign inventory of the contents of the backpack," but instead was "investigatory in nature." Mauricio, supra.

Taken together, the line of cases dating to Sullo stands for the following overarching point: where police validly have initiated the inventorying of objects taken into their custody for safekeeping, once their examination of such objects goes beyond "mechanical" cataloguing, the search becomes "investigatory in nature" and therefore must be justified as such. The cases also stand for a subtle but important procedural point. It remains the Commonwealth's burden to demonstrate that the inventory search exception applies to the discovery of the specific evidence at issue; the burden does not shift to the defendant just because the items in question properly had been seized and needed to be inventoried. See Vuthy Seng, 436 Mass. at 554 (explaining that although police may be justified in inventorying items, Commonwealth must still "present . . . evidence to carry its burden to establish that this was a lawful inventory search").

Of course, the boundaries drawn by such cases sometimes may be difficult to locate in practice. This is because the mere "fact that the searching officer may have harbored a suspicion that evidence of criminal activity might be uncovered as a result of [an inventory] search should not vitiate his obligation to conduct the inventory" (quotation and citation omitted). Commonwealth v. Garcia, 409 Mass. 675, 679 (1991). Moreover -- as Sullo itself touched on -- police conducting a valid inventorying need not ignore obvious incriminating evidence lying in plain view. 26 Mass. App. Ct. at 770. However, turning back to the case before us, I do not think it is difficult to determine on which side Reynolds's search of the defendant's car falls. In my view, the conclusion is inescapable that Reynolds was not engaged in a mechanical cataloguing of the car's contents. Notably, Reynolds did not testify that he filled out an inventory form, nor was any documentary evidence offered that he did so. In fact, other than his agreeing with the prosecutor's prompting that he had conducted an "inventory" search, Reynolds himself made no mention whatsoever of his cataloguing the car's contents. This is unsurprising given that -- as Reynolds effectively admitted -- he was searching the car to look for evidence to follow up on his suspicions that the defendant might be engaged in drug trafficking. In other words, this is not a case where a police

officer who benignly was inventorying a car's contents inadvertently happened across "obvious" or "overtly incriminating" evidence lying in plain view.  Vuthy Seng, 436 Mass. at 551 & n.12, 554.  To conclude otherwise on this record is to indulge in a fiction that the Constitution does not countenance.

My view of this case flows both from the objective facts of how Reynolds conducted the search, and from Reynolds's own characterization of his thought processes.  This can be shown, for example, with respect to Reynolds's key discovery of the wear mark on the carpeting at the edge of the center console.  By Reynolds's own admission, he discovered that wear mark because his training had taught him to look for it as an indicator that there may be a secret compartment hidden there.  The type and level of scrutiny that Reynolds applied to the center console and carpeting is comparable to that applied to the bank card in Vuthy Seng, 436 Mass. at 551-554, the keys in Blevines, 438 Mass. at 608-610, or "the markings on the backs of the cards" in Sullo, 26 Mass. App. Ct. at 772.[19]  Reynolds's

_____

[19] The police photographs of the interior of the car reveal at most a barely visible discoloration along the edge of the carpeting.  This is far from evidence that "declares its nature to anyone at sight."  Vuthy Seng, 436 Mass. at 553.  Of course, it may well be that such a sign was more immediately apparent to someone specifically looking for it with a well-trained eye.  However, the fact that the police utilized such mission-oriented expertise undermines the Commonwealth's claim that the officer

close examination had nothing to do with cataloguing the car's contents; rather, it was "investigatory in nature" and therefore needed to be supported by probable cause.

The discovery of the wear mark next to the center console provided the keystone on which the judge's finding of probable cause rests. Regardless of whether the judge was correct that Reynolds had probable cause to believe that the car contained illegal drugs after he discovered the wear mark, I believe it is plain that he did not have probable cause before that. Although Reynolds at that point may have had reasonable suspicion based on the various indicia he had collected in following up on his hunch -- the empty plastic bag, the rubber bands, the urine, the defendant's coming from a "source city," and so forth -- he did not have probable cause to believe that narcotics were hidden in the car. See Commonwealth v. Alvarado, 420 Mass. 542, 546, 550 (1995) (discovery of cocaine found in coffee maker inside box on floor of back seat of stopped car suppressed where search "was

---

was not conducting an investigatory search. The Supreme Judicial Court recently observed that "[t]he use of a drug detection dog to conduct what is supposedly a search to safeguard property -- and not a search for drugs -- raises a red flag." Commonwealth v. Davis, 481 Mass. 210, 219 (2019). Similar concerns are raised when the drug detection expert employed to do putative inventorying has two legs instead of four. Again, I do not question Reynolds's good faith; he ably was executing his job as he was trained to do. But it is up to the courts to determine whether his actions crossed the constitutional line designed to protect citizens from undue government intrusion.

of an investigatory nature" but not supported by probable cause, even though car's driver and passenger were from known "source city," cocaine was found on passenger who was "very nervous," and police observed driver of car reach his hand "near, or perhaps in, the coffee maker box just prior to his arrest"). See also Cordero, 477 Mass. at 243-247 (not even reasonable suspicion established where driver stopped for routine civil infraction was from "source city," had record of drug-related crimes, and had given evasive answers to trooper's questions). See generally Commonwealth v. Hason, 387 Mass. 169, 175 (1982), quoting Commonwealth v. Bond, 375 Mass. 201, 210 (1978) (to establish probable cause, although police need not make "a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt," "[w]hat ha[s] to be shown [i]s more than a suspicion of criminal involvement, something definite and substantial").

Given my views, I do not believe it is necessary to decide whether the plastic bag and the urine also were discovered through what amounted to an investigatory search. For completeness, however, I note my view that they were. The discarded, fast food bag and other detritus on the floor of the rear seat were of no apparent interest to someone cataloguing valuables in the car. See Commonwealth v. Muckle, 61 Mass. App. Ct. 678, 683 (2004) (observing -- in reference to crumpled fast

food bag that police searched during inventorying of car's contents -- that "[w]hile we recognize that valuables may be secreted virtually anywhere, a bag of trash is not a customary storage area for valuables").[20]  Even if safety concerns justified Reynolds in checking the discarded fast food bag as the majority suggests,[21] the undisputed facts belie that this was Reynolds's intent.  It would have taken but a glance to determine that there was no weapon in there.  The fact that after checking the fast food bag, Reynolds then scrutinized the empty, torn plastic bag found inside to see what type it was and

---

[20] In Muckle, we held that evidence found inside the bag had to be suppressed.  61 Mass. App. Ct. at 685.  That holding turned on the absence from the police department's written inventory search policy of an authorization of police to open closed containers (an absence not present in the case before us).  Id. at 684.  However, while compliance with a written inventory search policy may be a necessary prerequisite to an inventory search, the provisions of such a policy cannot override other constitutional requirements.  See Sullo, 26 Mass. App. Ct. at 768 (listing compliance with "a standard or routine procedure adopted and recognized by the police force" as only one of three criteria that valid inventory search must satisfy).

[21] A search of the trash in the rear seat could not be justified as a protective "frisk" of the car, because the defendant had already been removed from the car and was not going to be allowed back in to drive it.  See Commonwealth v. Manha, 479 Mass. 44, 50 (2018) (protective sweep of vehicle "must be confined to the area from which the suspect might gain possession of a weapon, either because he is still within the vehicle or because he is likely to return to the vehicle at the conclusion of the officer's inquiry" [quotation omitted]).  I state no view on whether a search of the bag for weapons was warranted for protection of whatever caretakers were slated to take possession of the impounded car.

proceeded to question the defendant about it demonstrated that his interest in the plastic bag was wholly investigatory, not custodial. With regard to the cup found to contain urine, Reynolds himself acknowledged that he opened the cup for the specific purpose of seeing whether drugs were secreted inside it, not to see if the cup was being used as a container to store valuables. See Alvarado, 420 Mass. at 553-554 (even though relevant inventory search policy stated that "[a]ll closed but unlocked containers should be opened," opening of coffee maker's water well held to be "of an investigatory nature" and therefore not part of valid inventory search).[22]

My concerns about Reynolds's sweeping search of the defendant's car are exacerbated by the fact that his suspicions were built in great part on the defendant's answers to questions that he had no business asking in the context of a routine traffic stop. See Cordero, 477 Mass. at 241-242. This is not to say that Cordero itself requires reversal; in light of the fact that Reynolds did not improperly detain the defendant after the traffic stop was, or should have been, completed, the holding of Cordero plainly does not apply. However, Cordero is

---

[22] Alvarado establishes that just because an item found in a car can, for some purposes, be considered an unlocked "container," it does not mean that police necessarily are justified in looking inside it as part of an inventorying of the car's contents. 420 Mass. at 553-554.

based on concerns about police improperly using routine traffic stops to conduct criminal investigations based on hunches that some of the people they have stopped might be guilty of unrelated offenses. See id. Those underlying concerns are equally present here.[23]

Finally, I address the majority's suggestion that we are bound by the judge's conclusion that the inventory search here was not done as a "pretext." The judge drew that conclusion in the context of distinguishing this case from Commonwealth v. Ortiz, 88 Mass. App. Ct. 573, 576-578 (2015). His assessment that -- unlike in Ortiz -- Reynolds did not stop the defendant in order to search his car is well supported by the record. Nor was Reynolds's decision that the contents of the car should be inventoried pretextual in this sense. The problem here is not that Reynolds was acting in bad faith; indeed, throughout his testimony, Reynolds was laudably forthcoming about both his investigatory actions and what motivated them. Rather, the problem is that once he went beyond a mechanical cataloguing of the car's contents, he exceeded the "sole justification" for exempting the search from the constitutional requirement of

---

[23] It bears remembering that because of "explicit bias (i.e., racial profiling), unconscious bias, or a combination of both" (footnote omitted), "pretextual [traffic] stops disproportionately affect people of color," even where the driver was not stopped merely for "driving while black." Buckley, 478 Mass. at 876, 878 & n.4 (Budd, J., concurring).

probable cause.  Sullo, 26 Mass. App. Ct. at 768.  At that point, any efforts to invoke the label of an inventory search became a "cover" for what amounted to an investigatory search, which needed to be justified as such.[24]  Id.

Conclusion.  In my view, the Commonwealth was unable to meet its burden of proving that its discovery of the well-secreted drug hide here was valid, and the motion to suppress therefore should have been allowed.  Beyond the outcome of this case, however, I am concerned about the message that the

---

[24] Even in the context of discussing police conduct, the cases use the term pretext in different respects.  In some cases, the term is used to refer to police officers' having taken an action for a different reason than they claim, that is, misstating their motivations.  See Buckley, 478 Mass. at 866-867 (referring to defendant's contention that he was stopped not because of observed traffic violation but for other reasons as allegation of "pretext").  This meaning of the term does not apply here.  In Sullo, Justice Kaplan used pretext in a less loaded sense, not to indicate bad faith, but as synonymous with the term "cover."  26 Mass. App. Ct. at 768.  In other words, pretext is used in Sullo to refer to where police have initiated a valid inventorying of items they have seized, but their actions have strayed beyond narrow custodial aims.  See Murphy, 63 Mass. App. Ct. at 15-16 (evidence must be suppressed not because officer doing inventorying "harbored an investigatory motive," but because his close examination of items seized exceeded purpose of inventorying).  That is precisely what occurred here.  Assessing whether the inventorying became pretextual in this sense does not require us to divine the "true" motivations of Reynolds, nor does it invade the judge's fact finding role.  Rather, it calls upon us to serve our proper role of examining the judge's ultimate findings to see whether he correctly applied constitutional principles.  See Mauricio, 477 Mass. at 591, quoting Commonwealth v. Wilson, 441 Mass. 390, 393 (2004) ("[w]e review independently the application of constitutional principles to the facts found").

majority opinion effectively delivers.  That message is that any time a police officer has a valid justification for having a car towed, he has free rein to conduct a sweeping investigatory search of that car without probable cause, under the guise of an "inventory search," so long as there is a written inventory search policy in place and the officer does not exceed the express bounds of that policy.  Such a ruling improperly relieves the Commonwealth of its burden to prove that an exception to the probable cause requirement is warranted under the particular circumstances presented.  What's more, it threatens to immunize inventory searches from any meaningful judicial oversight.